In the MATTER OF THE REHABILITATION OF: Segregated Account of AMBAC ASSURANCE CORPORATION:

Ted NICKEL and Office of the Commissioner of Insurance, Plaintiffs-Respondents,

AMBAC ASSURANCE, Interested Party-Respondent,

v.

WELLS FARGO BANK/TRUSTEE OF BONDHOLDERS, Bank of New York Mellon and Deutsche Bank National Trust Company, Defendants,†

FEDERAL HOME LOAN MORTGAGE CORPORATION, Defendant-Petitioner-Co-Appellant,

AURELIUS CAPITAL MANAGEMENT LP, Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Monarch Alternative Capital LP and Stonehill Capital Management LLC, Defendants-Petitioners-Appellants,

EATON VANCE MANAGEMENT, Nuveen Asset Management, Restoration Capital Management LLC and Stone Lion Capital Partners LP, Defendants-Co-Appellants-Petitioners.†
[Case No. 2010AP1291]

In the MATTER OF THE REHABILITATION OF: SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION:

---

† Petitions for Review Filed.

Ted NICKEL and Office of the Commissioner of Insurance, Plaintiffs-Respondents,

AMBAC ASSURANCE, Interested Party-Respondent,

v.

WELLS FARGO BANK/TRUSTEE OF BONDHOLDERS, Defendant-Co-Appellant,†

BANK OF NEW YORK MELLON, Deutsche Bank National Trust Company, Federal Home Loan Mortgage Corporation, Aurelis Capital Management LP, Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Monarch Alternative Capital LP, Nuveen Asset Management, Restoration Capital Management LLC, Stone Lion Capital Partners LP and Stonehill Capital Management LLC, Defendants,†

Eaton Vance Management, Defendant-Appellant.†
[Case No. 2010AP2022]

IN the MATTER OF THE REHABILITATION OF:
SEGREGATED ACCOUNT OF
AMBAC ASSURANCE CORPORATION:

Ted NICKEL and Office of the Commissioner of Insurance, Petitioners-Respondents,

AMBAC ASSURANCE, Interested Party-Respondent,

ONE STATE STREET LLC,
Interested Party-Appellant,

ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION, Aurelis Capital Management LP,

540

Bank of New York Mellon, Customer Asset Protection Company ("CAPCO"), Depfa Bank, plc, Deutsche Bank National Trust Company, Eaton Vance Management, Federal Home Loan Mortgage Corporation, Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Lloyds TSB Bank plc, Monarch Alternative Capital LP, Nuveen Asset Management, Restoration Capital Management LLC, Stone Lion Capital Partners LP, Stonehill Capital Management LLC, Wells Fargo Bank/Trustee of Bondholders, Wilmington Trust Company and Wilmington Trust FSB, Interested Parties†
[Case No. 2010AP2835]

IN the MATTER OF THE REHABILITATION OF:
SEGREGATED ACCOUNT OF
AMBAC ASSURANCE CORPORATION:

Ted NICKEL and Office of the Commissioner of Insurance, Petitioners-Respondents,

AMBAC ASSURANCE, Interested Party-Respondent,

AURELIS CAPITAL MANAGEMENT LP, Bank of America, N.A., Customer Asset Protection Company ("CAPCO"), Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, Eaton Vance, Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal National Mortgage Association ("Fannie Mae"), Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Monarch Alternative Capital LP, Stonehill Capital

541

Management LLC, U. S. Bank National
Association, Wells Fargo Bank, N.A., Wells Fargo
Bank, N.A. as Trustee for the LVM Bondholders,
Wilmington Trust Company, Wilmington Trust
FSB, Interested Parties-Appellants,†

ACCESS TO LOANS FOR LEARNING STUDENT LOAN
CORPORATION, Assured Guaranty Corporation,
Bank of New York Mellon, Countrywide Home
Loans Servicing L.P., Depfa Bank, plc, Goldman
Sachs & Co., Inc., HSBC Bank USA, National
Association, Knowledgeworks Foundation, Lloyds
TSB Bank plc, One State Street LLC, Nuveen
Asset Management, PNC Bank, Restoration
Capital Management LLC, Stone Lion Capital
Partners LP and Treasurer of the State of Ohio,
United States of America, Interested Parties.
[Case No. 2011AP561]

Court of Appeals

*Nos. 2010AP1291, 2010AP2022, 2010AP2835, 2011AP561.
Submitted on the briefs February 17, 2011 and
December 8, 2011.—Decided October 24, 2013.*

2013 WI App 129

(Also reported in 841 N.W.2d 482.)

545

On behalf of the appellants and co-appellants, the cause was submitted on the briefs of *Bryan K. Nowicki, R. Timothy Muth* and *Jessica Hutson Polakowski* of *Reinhart Boerner Van Deuren s.c.,* Madison; *Michael T. Brody, David M. Greenwald, Andrew J. Olejnik* and *John B. Simon* of *Jenner & Block LLP,* Chicago, IL, and *Patrick J. Trostle* of *Jenner & Block LLP*, New York, NY, of counsel; *Noreen J. Parrett* and *Connie L. O'Connell* of *Parrett & O'Connell, LLP*, Madison; *Philip Bentley, Amy Caton* and *Susan Jacquemot* of *Kramer*

*Levin Naftalis & Frankel LLP*, New York, NY, of counsel; *Thomas Armstrong, David I. Cisar* and *Christopher J. Stroebel* of *von Briesen & Roper, s.c.,* Milwaukee; *Craig S. Bloomgarden* of *Manatt, Phelps & Phillips, LLP*, Los Angeles, CA, and *Marcia D. Alazraki* of *Manatt, Phelps & Phillips, LLP*, New York, NY, of counsel; *Seth E. Dizard, Grant C. Killoran, Gregory W. Lyons* and *Laura J. Now* of *O'Neil, Cannon, Hollman, DeJong & Laing S.C.* of Milwaukee; *Thomas J. Welsh* of *Orrick, Herrington & Sutcliffe LLP*, Sacramento, CA, of counsel admitted *pro hac vice*; *John Franke* and *Beth Ermatinger Hanan* of *Gass Weber Mullins LLC*, Milwaukee; *Paul E. Benson, Paul A. Lucey* and *Nathan L. Moenck* of *Michael Best & Friedrich LLP*, Milwaukee; *Kristine Bailey* and *John M. Rosenthal* of *Morgan, Lewis & Bockius LLP*, San Francisco, CA, and *Allyson N. Ho* of *Morgan, Lewis & Bockius LLP*, of Houston, TX, admitted *pro hac vice*; *Jeffrey O. Davis* and *Gregory T. Everts* of *Quarles & Brady LLP*, Madison; *Kenneth M. Argentieri, Jeffrey W. Spear* and *Joel M. Walker* of *Duane Morris LLP*, Pittsburgh, PA, of counsel admitted *pro hac vice*; *Jennifer M. Krueger* and *Stephen L. Morgan* of *Murphy Desmond S.C.*, Madison; *Steven T. Whitmer* and *Kevin A. Wisniewski* of *Locke Lord Bissell & Liddell LLP*, Chicago, IL, of counsel; *Jane C. Schlicht* of *Cook & Franke, S.C.*, Milwaukee; *Michael E. Johnson* of *Alston & Bird LLP*, New York, NY, of counsel *pro hac vice*; *Lawrence Bensky* of *Law Office of Lawrence Bensky, LLC*, Madison; and *James C. Owen* of *McCarthy, Leonard & Kaemmerer, L.C.*, Chesterfield, MO, *pro hac vice*.

On behalf of the respondents, the cause was submitted on the briefs of *Matthew R. Lynch, Naikang Tsao* and *Michael B. Van Sicklen* of *Foley & Lardner LLP*, Madison; *Barbara A. Neider and Daniel W. Stolper* of

*Stafford Rosenbaum LLP*, Madison; and *Peter A. Ivanick, William G. Primps, Richard W. Reinthaler, Henry J. Ricardo* and *Emily L. Staffitz* of *Dewey & Leboeuf LLP*, New York, NY, of counsel.

Before Higginbotham, Sherman and Reilly, JJ.

¶ 1. HIGGINBOTHAM, J. These are appeals of a circuit court order approving a rehabilitation plan of the segregated account of Ambac Assurance Corporation (Ambac) and other court orders entered earlier in this proceeding.[2] Numerous interested parties challenge the validity of various provisions of the rehabilitation plan on various grounds as well as actions taken by the Office of the Commissioner of Insurance (commissioner) in relation to the formulation of the plan with the approval of the circuit court. The interested parties also challenge various court orders relating to numerous matters, including the approval of a proposed hearing schedule, the establishment of a segregated account, the issuance of injunctive relief, and the refusal to enjoin a settlement agreement between Ambac and a group of financial institutions. For the reasons that follow, we conclude that the circuit court properly exercised its discretion in confirming the rehabilitation plan and in entering the other orders that the interested parties challenge on appeal. Accordingly, we affirm.

## BACKGROUND

¶ 2. Ambac, a Wisconsin insurance company with headquarters in New York, is one of the largest insurers of financial guarantees in the world. Ambac is a wholly-

---

[2] The above appeals are consolidated for the purpose of disposition.

owned subsidiary of Ambac Financial Group Inc., a holding company headquartered in New York City.

¶ 3. Beginning in late 2007, Ambac's books of business began to suffer due to mounting liabilities, dwindling claims-paying resources, and plummeting credit ratings. As a result of these financial challenges, Ambac stopped writing new insurance policies in mid-2008.

¶ 4. Also beginning in late 2007, the commissioner increased its oversight of Ambac and retained financial, legal, and insurance industry experts to monitor Ambac's financial condition. Ambac's financial condition continued to worsen over the next two years and by early 2010 it became apparent that the commissioner needed to take formal regulatory action to save Ambac from insolvency.

¶ 5. The commissioner proceeded by establishing a segregated account for Ambac's greatest liabilities. Working closely with insurance industry experts, the commissioner identified approximately 1000 out of 15,000 Ambac policies that imperiled Ambac's financial stability and assigned those policies to the segregated account. The commissioner decided against pursuing a full rehabilitation or liquidation of Ambac's business and instead decided on a targeted partial rehabilitation pertaining only to the segregated account. Pursuing a targeted partial rehabilitation, according to the commissioner, was necessary to prevent the triggering of acceleration and early termination provisions under the contracts governing certain financial transactions, which would have caused massive financial losses that would have jeopardized the company.

¶ 6. On March 24, 2010, the commissioner submitted a verified petition for the rehabilitation of the segregated account in Dane County Circuit Court. The court entered an order for rehabilitation, appointed the commissioner as rehabilitator, and directed that the

commissioner proceed in accordance with the plan of operation for the segregated account. The court also granted the commissioner's request for a temporary injunction, which, in relevant part, enjoined any persons or entities from commencing or prosecuting claims related to the rehabilitation proceedings and from taking any action that could have the potential to lessen Ambac's assets.

¶ 7. Approximately six months later, the commissioner filed in the circuit court, among other documents, a plan of rehabilitation and a disclosure statement outlining the terms of the plan. We highlight some of the most important features of the plan.

¶ 8. The segregated account is capitalized by a secured note in the amount of $2 billion dollars and an aggregate excess of loss reinsurance agreement. Pursuant to the rehabilitation plan, the segregated account may call upon the general account to pay all claims allocated to the segregated account as long as the payment of the segregated account claims does not cause Ambac's assets to fall below $100 million, less than 2% of Ambac's claims-paying assets. Thus, the segregated account has access to approximately 98% of Ambac's assets. At least initially, holders of claims allocated to the segregated account will receive 25% of their claims in cash and 75% in surplus notes. The surplus notes mature in June 2020, but at some time before the maturity date, the commissioner will assess the need to modify that date to allow for the continuation or reissuance of surplus notes after 2020. It is projected that the surplus notes may not be paid until 2050, if not later.

¶ 9. In November 2010, the circuit court held a five-day evidentiary hearing on whether to approve the rehabilitation plan. Objectors to the rehabilitation plan

were allowed to submit written objections to the plan and to participate in the hearing, although they were not allowed to conduct discovery prior to the hearing or to formally intervene in the rehabilitation proceedings.[3] Following the hearing, the court approved the rehabilitation plan.

¶ 10. On appeal, numerous interested parties challenge the decisions made by the commissioner in formulating the rehabilitation plan and by the court in approving the plan.

## DISCUSSION

¶ 11. We organize our discussion of the issues presented in these appeals as follows. First, we provide background information regarding insurance rehabilitations in Wisconsin, as set forth in WIS. STAT. ch. 645 (2011–12),[4] the Wisconsin Insurers Rehabilitation and Liquidation Act. See WIS. STAT. § 645.05(1). Second, we explain the standard of review that we apply in reviewing the circuit court's decision to approve the rehabilitation plan proposed by the commissioner. Third, we address and reject the arguments raised in the consolidated brief on appeal, in the order in which they are presented.[5] Fourth, we address and reject the argu-

---

[3] We refer to the objectors to the rehabilitation plan collectively as the "interested parties," and not as the appellants. As we stated in our May 5, 2011 order, we do so because rehabilitation proceedings generally have a petitioner and a subject.

[4] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

[5] The following interested parties have joined in the consolidated brief: the Federal Home Loan Mortgage Corporation (Freddie Mac) and the Federal National Mortgage Association (Fannie Mae). Wells Fargo Bank, N.A., as trustee for the LVM bondholders, has joined in the consolidated brief, with the

ments raised in the briefs separately filed by various interested parties on topics not raised in the consolidated brief.[6] Fifth, and finally, we address and reject the arguments made in an earlier appeal, primarily concerning the establishment of the segregated account and the approval of a settlement agreement between Ambac and a number of large financial institutions.

## I. Background on Insurance Rehabilitation

¶ 12. WISCONSIN STAT. ch. 645 governs insurance rehabilitation and liquidation in Wisconsin. The chapter shall be "liberally construed" for "the protection of the interests of insureds, creditors, and the public generally, with minimum interference with the normal prerogatives of proprietors . . . ." WIS. STAT. § 645.01(3), (4). Under Wisconsin's insurance rehabilitation statutory scheme, rehabilitation "may be used when there is a chance of saving the insurer without unduly endangering the interests of others." General comment to

_____

exception of the second, third, and fourth arguments presented. Access to Loans for Learning Student Loan Corporation (ALL), Lloyds TSB Bank plc (Lloyds), and Depfa Bank plc (Depfa) initially joined in the consolidated brief but have since been dismissed from these appeals. We therefore do not address the arguments made in separate briefs filed by the dismissed interested parties.

[6] Many of the arguments raised in the individual briefs are merely a repeat of the arguments raised in the consolidated brief, and, in our May 5, 2011 scheduling order, we instructed the interested parties not to repeat arguments in their individual briefs. Therefore, to the extent that the interested parties have filed individual briefs raising arguments that are the same or substantially similar to those presented in the consolidated brief, we will not address those arguments. In addressing the new arguments raised in the individual briefs, we identify which interested parties have raised those arguments and refer to them by name, unless otherwise indicated.

Subchapter III, Formal Proceedings, 1967 Wis. Laws, ch. 89, § 17. The legislature designed the insurance rehabilitation statutory scheme to be flexible and informal and conferred substantial power to the rehabilitator to effectuate rehabilitation:

> [The statutory scheme] is designed to make rehabilitation a very flexible procedure. It is essential that it be regarded as a management rather than as a legal task. Though it is called a formal proceeding because it begins with a formal petition to a court and a hearing, thereafter it should be essentially informal in operation. The [rehabilitation] order is formulated to emphasize flexibility and informality, and the rehabilitator is given broad powers. He [or she] must act under the supervision of the court, of course, but the court's control should be liberal, not strict, and should be provided without cumbersome procedures.

Introductory comment to WIS. STAT. § 645.32, 1967 Wis. Laws, ch. 89, § 17.

¶ 13. To commence insurance rehabilitation proceedings, the insurance commissioner submits a verified petition for an order of rehabilitation to the circuit court. WIS. STAT. § 645.31. There are several grounds upon which the commissioner may submit a petition, including, as pertinent here, when "he or she believes that the insurer may be successfully rehabilitated without substantial increase in the risk of loss to creditors of the insurer or to the public." § 645.31(1). An order to rehabilitate the business of an insurer "shall appoint the commissioner . . . rehabilitator and shall direct the rehabilitator to take possession of the assets of the insurer and to administer them under the orders of the court." WIS. STAT. § 645.32(1).

¶ 14. Although the rehabilitator operates under the supervision of the court, the rehabilitator has broad powers. "Subject to court approval, the rehabilitator may take the action he or she deems necessary or expedient to reform and revitalize the insurer." WIS. STAT. § 645.33(2). The rehabilitator is granted "all the powers of the officers and managers" of the insurance company being rehabilitated and has "full power to direct and manage, to hire and discharge employees subject to any contract rights they may have, and to deal with the property and business of the insurer." *Id.* To determine how to reform and revitalize the insurer, "[t]he rehabilitator may consult with and obtain formal or informal advice and aid of insurance experts." § 645.33(3). Based on the advice of experts, "[t]he rehabilitator may prepare a plan for the reorganization, consolidation, conversion, reinsurance, merger or other transformation of the insurer." § 645.33(5).

¶ 15. Once a rehabilitation plan is prepared, the rehabilitator files the plan with the circuit court for the court's approval. "Upon application of the rehabilitator for approval of the plan, and after such notice and hearing as the court prescribes, the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified." *Id.* Once the court approves the plan, the rehabilitator is required to carry out the plan. *Id.* With this background in mind, we turn to consider the standard of review.

II. Standard of Review

¶ 16. In this case, we are required to examine the discretionary determinations made by the circuit court in approving the commissioner's rehabilitation plan pursuant to the rehabilitation statutory scheme set

forth in WIS. STAT. ch. 645. We will review the circuit court's approval of the rehabilitation plan under an erroneous exercise of discretion standard, in line with other jurisdictions that follow the Insurers Rehabilitation and Liquidation Act (IRLA). We will uphold a circuit court's exercise of discretion as long as the court "reviewed the relevant facts; applied a proper standard of law; and using a rational process, reached a reasonable conclusion." *State v. Davidson*, 2000 WI 91, ¶ 53, 236 Wis. 2d 537, 613 N.W.2d 606. In reviewing the court's discretionary decision to approve the plan, we will affirm the court's findings of fact unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2); *Phelps v. Physicians Ins. Co.*, 2009 WI 74, ¶ 39, 319 Wis. 2d 1, 768 N.W.2d 615.

■

¶ 17. In the context of insurance rehabilitations, the circuit court erroneously exercises its discretion when an examination of the rehabilitation plan demonstrates that the circuit court exceeded its statutory authority or the court unreasonably substituted the rehabilitator's beliefs for its own beliefs. *See, e.g., Foster v. Mutual Fire, Marine and Inland Ins. Co.*, 531 Pa. 598, 610–11, 614 A.2d 1086 (1992) (providing the standard of review for insurance rehabilitations in a jurisdiction that, similar to Wisconsin, follows the IRLA).

¶ 18. When reviewing the circuit court's decision to approve the rehabilitation plan, we will uphold the determinations made by the rehabilitator unless the rehabilitator abused his or her discretion. *See id.* at 609 ("[I]t is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator. Rather, the involvement of the judicial process is limited to the safeguarding of the plan from any potential abuse of the Rehabilitator's discretion.");

*Mills v. Florida Asset Fin. Corp.*, 31 A.D.3d 849, 850, 818 N.Y.S.2d 333 (3rd Dep't 2006) ("The courts will generally defer to the rehabilitator's business judgment and disapprove the rehabilitator's actions only when they are shown to be arbitrary, capricious or an abuse of discretion."); *Kentucky Cent. Life Ins. Co. v. Stephens*, 897 S.W.2d 583, 588 (Ky. 1995) ("[T]he standard of the court's review of the rehabilitator's actions is one of abuse of discretion. Under the special statutory proceedings, the Commissioner is granted administrative discretion in the context of the insolvency/delinquency proceedings.").

¶ 19. This case also requires us to engage in statutory interpretation. In general, statutory interpretation presents a question of law subject to de novo review. *MercyCare Ins. Co. v. Wisconsin Comm'r of Ins.*, 2010 WI 87, ¶ 26, 328 Wis. 2d 110, 786 N.W.2d 785. However, a court may afford varying degrees of deference to an agency's interpretation of a statute that it is charged with administering. *Racine Harley-Davidson, Inc. v. DHA*, 2006 WI 86, ¶ 11, 292 Wis. 2d 549, 717 N.W.2d 184. We conclude that it is appropriate to afford great weight deference to the commissioner's interpretation and application of the statutes governing the rehabilitation of an insurer and other related statutes the commissioner is charged with administering.

¶ 20. We acknowledge that the question of how much deference to give an agency's interpretation and application of a statute generally arises when an agency makes a final decision regarding the meaning of a statute following an administrative proceeding. *See, e.g., UFE Inc. v. LIRC*, 201 Wis. 2d 274, 280–81, 548 N.W.2d 57 (1996). Here, we are reviewing the rehabilitation plan that the commissioner submitted for the

circuit court's approval, and not a final agency decision made following an administrative proceeding. Although this case presents unique issues in a context not previously addressed by Wisconsin appellate courts, we nonetheless conclude that the commissioner's determinations regarding the interpretation and application of statutes it is charged with administering are entitled to great weight deference.

██

¶ 21. Great weight deference is appropriate when four requirements are met: "(1) the agency is charged by the legislature with the duty of administering the statute; (2) the agency interpretation is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute." *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 16. We affirm an agency's interpretation of a statute if it is reasonable, even if we believe that another interpretation is more reasonable. *National Motorists Ass'n v. OCI*, 2002 WI App 308, ¶ 13, 259 Wis. 2d 240, 655 N.W.2d 179.

¶ 22. We are satisfied that each of the four criteria for granting great weight deference is met in this case. First, the commissioner is charged by statute with administrating and enforcing WIS. STAT. chs. 600 to 655, including ch. 645, the statutory scheme governing rehabilitation and liquidation. *See* WIS. STAT. § 601.41(1). Second, the commissioner's interpretation of statutes under ch. 645 is long standing, dating back to at least 1967 when the legislature created the chapter. *See* 1967 Wis. Laws, ch. 89. Third, the commissioner has extensive expertise and specialized knowledge in the complex world of insurance rehabilitation and is vested with

broad discretion and authority to structure a rehabilitation plan. *See* Wis. Stat. § 645.33(2). Fourth, applying great weight deference will provide uniformity and consistency in the application of the insurance rehabilitation statutes.

### III. Consolidated Brief

¶ 23. We turn now to address the arguments raised by the interested parties in the consolidated brief, in the order in which they have been presented.

### A. Circuit Court's Findings of Fact

¶ 24. The interested parties argue that the circuit court erroneously exercised its discretion by adopting "wholesale" the commissioner's proposed findings of fact and conclusions of law, rather than conducting an independent analysis that reflects the court's independent judgment. In support, the interested parties rely on *Trieschmann v. Trieschmann*, 178 Wis. 2d 538, 542, 504 N.W.2d 433 (Ct. App. 1993), where, according to the interested parties, this court held that a circuit court erroneously exercises its discretion "where it simply 'accept[s one party's] position on all of the issues of fact and law' and fails to articulate the facts upon which it based its decision." The interested parties contend that, because the circuit court here adopted the commissioner's proposed findings without explaining why it accepted those findings over the findings of the interested parties, the circuit court erroneously exercised its discretion. We disagree.

¶ 25. We begin by observing that the interested parties' reliance on *Trieschmann* is misplaced. *Trieschmann* involved a divorce proceeding, in which the circuit court adopted the former wife's positions in

her brief submitted to the court regarding issues of maintenance and division of property without explaining its reasoning for adopting those positions other than to state that it was "the only just solution to the matter." *Trieschmann*, 178 Wis. 2d at 541 (quoting another source). On appeal in that case, we determined that the circuit court erroneously exercised its discretion because the court "failed to articulate the factors upon which it based its decision . . . [and] failed to indicate *why* it believed [the former wife's] proposal provided the proper result." *Id.* at 542. However, we have previously suggested that *Trieschmann* does not apply outside the context of divorce proceedings. *See Kersten v. H.C. Prange Co.*, 186 Wis. 2d 49, 60, 520 N.W.2d 99 (Ct. App. 1994) (declining to apply *Trieschmann* to a contract dispute).

¶ 26. Here, we are persuaded that *Trieschmann* does not apply in the context of rehabilitation proceedings. There are substantial distinctions between the requirements a court must meet in explaining its reasons for a decision in a family law proceeding and the requirements in a rehabilitation proceeding. In family law cases, courts are held to a high standard with respect to explaining the reasons upon which a court relied in making its decision. *See Trieschmann*, 178 Wis. 2d at 541–42. In *Trieschmann*, we explained that a trial court's decision in a family law case must "be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." *Id.* (quoting another source). This requires the court to state its findings of fact, conclusions of law, and the factors upon which the court relied in reaching its decision. *Id.* at 542.

¶ 27. The same is not true with respect to rehabilitation proceedings. As we have explained, the legislature intended for rehabilitation proceedings such as this to be informal and "provided without cumbersome procedures." Comments to Wis. Stat. § 645.32, 1967 Wis. Laws, ch. 89, § 17. There is no statutory requirement in Wis. Stat. ch. 645 providing that a court must specify the facts upon which it relied in approving a rehabilitation plan, and the interested parties do not cite any authority imposing such requirements on a circuit court. Upon submission of a plan for approval, a court "may either approve or disapprove the plan proposed, or may modify it and approve it as modified." Wis. Stat. § 645.33(5). Nothing more is required of the rehabilitation court with respect to explaining its reasons for approving a rehabilitation plan. Therefore, in general, a court cannot be reversed for approving a commissioner's rehabilitation plan on the basis that it did not set forth its reasoning or make any findings of fact or conclusions of law. *See In re Callahan*, 102 Wis. 557, 561, 78 N.W. 750 (1899) ("The rule is well established . . . that the decision [of the circuit court] will not be reversed for want of finding[s] of fact[], if the evidence supports it, especially in a special proceeding.") (citations omitted).

¶ 28. In any event, the interested parties are incorrect that the record is devoid of the court's reasoning. The court indicated at the hearing on the approval of the plan that it found the testimony of Roger Peterson, the director of the bureau of financial analysis and examinations for the commissioner, to be particularly credible and that his testimony established that the commissioner appropriately exercised its discretion in formulating a plan that was "fair and equitable" and in "the best interest of the[] policyholders." Although the court did

not make an oral ruling setting forth in specific detail its reasons for approving the plan, the court generally described the testimony it was relying on in reaching its conclusion.

¶ 29. Finally, the interested parties have the burden of challenging specific findings of fact and conclusions of law, and the interested parties have failed to meet their burden in this case. See *Loeb v. Board of Regents*, 29 Wis. 2d 159, 164, 138 N.W.2d 227 (1965) ("A party seeking judicial process to advance his position carries the burden of proof"); *see also Kentucky Cent. Life Ins. Co.*, 897 S.W.2d at 588 ("[T]he burden of proof is upon those contesting the Commissioner's actions."). The interested parties state in conclusory fashion that the circuit court adopted the commissioner's proposed findings "even where they were conclusory, unsupported by, or contrary to[] the evidentiary record." However, the interested parties do not take issue with specific findings and then explain why those findings were clearly erroneous. Because the interested parties do not explain in any detail which findings were erroneous and why those findings were erroneous, we conclude that they have not met their burden to prove that the court's findings were clearly erroneous.

¶ 30. For all of these reasons, we reject the interested parties' argument that the circuit court erroneously exercised its discretion by failing to exercise its independent judgment in approving the rehabilitation plan.

B. Capitalization of the Segregated Account

¶ 31. The interested parties contend that the circuit court erred in approving the formation of the

segregated account because the account has not "main-tain[ed] an adequate amount of capital and surplus," as required under Wis. Stat. § 611.24(3)(a). The interested parties provide two reasons in support of their contention. First, the segregated account contains only liabilities and no assets, and second, under the terms of the secured note and reinsurance agreement, Ambac will no longer have access to the assets held in the general account if Ambac's statutory surplus falls below $100 million.

¶ 32. In response, the commissioner maintains that the segregated account is adequately capitalized from assets held in the general account. Specifically, the commissioner points out that under the rehabilitation plan, the segregated account and the general account have equal access to the same common pool of resources held in the general account. According to the commissioner, this structure protects Ambac's claims-paying resources and provides the necessary resources to satisfy the segregated account liabilities.

¶ 33. It is helpful at this point in our discussion to provide a brief history of the creation of the segregated account in this case, as it has been recounted by the commissioner in its appellate brief and as supported by the record.

¶ 34. As we explained above, in early 2010, the commissioner decided to take formal regulatory action under Wis. Stat. ch. 645 to address the increasing risks Ambac's deteriorating financial condition posed to its policyholders, creditors, and the public. The commissioner carefully considered the advantages and disadvantages of liquidating Ambac, rehabilitating Ambac as a whole, or conducting a targeted rehabilitation of parts of Ambac through a segregated account.

¶ 35. Ambac's books of business involve unique risks because Ambac insures "some of the most complicated financial instruments ever created." By way of example, Ambac's policies insured "intricate, individually negotiated transactions that generally include embedded covenants, default triggers, and liquidated-damages provisions tied to the avoidance of formal delinquency proceedings." According to the commissioner, the triggering of these risks would have resulted in substantial claims being brought against Ambac, thereby "resulting in more claimants competing for distributions from a smaller pool of claims-paying resources, among other consequential harms."

¶ 36. The commissioner opted for a targeted rehabilitation of Ambac using "a surgical segregated account approach" because, in the commissioner's informed opinion, this would provide the most beneficial outcome for all policyholders, without triggering massive avoidable losses. The segregated account was established under WIS. STAT. § 611.24(2), which permits a corporation, with the commissioner's approval, to "establish a segregated account for any part of its business." "Segregated accounts, by their very nature, are the equivalent of a 'company within a company.' " Note to WIS. STAT. § 611.24, 1979 Wis. Laws, ch. 109, § 1r.

¶ 37. The commissioner conducted an extensive assessment of Ambac's business, including "key categories of policies and particularly troubled individual policies to understand their terms and expected losses." After completing this assessment, the commissioner approved the allocation of approximately 1000 policies with material projected losses, structural problems, and contractual triggers to the segregated account and left the remaining 14,000 "healthy, performing policies" in the general account.

¶ 38. As we have indicated, when the segregated account was created, it was capitalized by imposing a secured note for $2 billion and an excess of loss reinsurance agreement against the general account. The purpose of doing so was to isolate the claims-paying resources in the general account from the liabilities in the segregated account in order to avoid various contractual default triggers. By capitalizing the segregated account with the secured note and reinsurance agreement, the segregated account obtained "absolute, on-demand use of *all* assets of the General Account to satisfy Segregated Account liabilities."

¶ 39. With this background in mind, we now address the interested parties' arguments.

¶ 40. We address first the interested parties' argument that the formation of the segregated account was inadequately capitalized because the account consisted only of liabilities and no assets. We disagree. The interested parties ignore the approach taken by the commissioner to capitalize the segregated account by imposing a secured note for $2 billion and an excess of loss reinsurance agreement against the general account. As we have explained, this gave the segregated account absolute, on-demand use of all assets of the general account to satisfy the segregated account liabilities. The circuit court found that this approach to capitalizing the segregated account was reasonable, a finding that the interested parties do not challenge as being clearly erroneous. As we have explained, this approach allows Ambac to protect its claims-paying resources from the contractual default triggers, embedded covenants, and liquidated-damages provisions that would likely result in financial disaster for the corporation.

¶ 41. We also reject the interested parties' argument that the segregated account is inadequately capitalized because, under the terms of the secured note and reinsurance agreement, Ambac is not required to make any payments out of the general account to the segregated account if Ambac's statutory surplus falls below $100 million. The interested parties fail to point to anything in the record, such as an assessment of Ambac's surplus assets, which would reasonably suggest that the statutory surplus is expected to fall below $100 million.

¶ 42. The interested parties also do not dispute that the commissioner enjoys broad discretion to set the minimum capital and surplus amounts in a segregated account. The commissioner's discretion in setting minimum capital and surplus amounts is guided by WIS. STAT. § 611.24(3)(a). Under this statute, "the commissioner shall require the corporation to have and maintain an adequate amount of capital and surplus in the segregated account." WIS. STAT. § 611.24(3). Whether a segregated account has an adequate share of the corporation's capital and surplus is left to the commissioner's discretion. *See* Note to WIS. STAT. § 611.19, 1971 Wis. Laws, ch. 260, § 72. ("[M]uch discretion should be left to the commissioner to set minimum capital and surplus requirements[.]").

¶ 43. After an extensive assessment of Ambac's complex books of business, the record shows that the commissioner carefully considered various approaches to protect the corporation from the expected losses by the most troubled policies. As the commissioner explains in its appellate brief, "it was imperative that Ambac's claims-paying resources remain in the General Account" because they would be "subject to accelera-

574

tion, early termination and other triggers" if Ambac directly capitalized the segregated account with assets from the general account.

¶ 44. We must defer to the commissioner's extensive experience and expertise in rehabilitating insurers in setting the minimum capital and surplus of the segregated account. We also note that the approach taken by the commissioner to capitalize the segregated account was reached after substantial assistance from highly regarded experts in the insurance and finance industries. The circuit court found that the capitalization of the segregated account was fair and adequate for rehabilitation and we see no reason to disrupt that finding.

¶ 45. In sum, the interested parties provide no persuasive reason for us to reverse the circuit court's determination that the commissioner's approach to capitalizing the segregated account was a proper exercise of the commissioner's discretion.

C. Priority of Claims

¶ 46. The interested parties next contend that the plan of rehabilitation is unlawful because it fails to meet the requirements of Wis. Stat. § 645.68, pertaining to the order of distribution of claims. The statute states in pertinent part:

> The order of distribution of claims from the insurer's estate shall be as stated in this section . . . . [E]very claim in each class shall be paid in full or adequate funds retained for the payment before the members of the next class receive any payment. No subclasses shall be established within any class . . . .

The statute then sets forth the order of distribution of claims, beginning with administration costs and ending with proprietary claims. *See* Wis. Stat. § 645.68(1)-(11).

¶ 47. According to the interested parties, the rehabilitation plan violates Wis. Stat. § 645.68 because it does not follow the stated order of distribution and because it treats holders of claims allocated to the segregated account as a subclass within the class of claims that includes claims held in the general account.

¶ 48. At the outset, we observe that the interested parties' arguments assume that the priority system set forth in Wis. Stat. § 645.68 applies to rehabilitation proceedings. Whether § 645.68 applies to rehabilitation proceedings has not been addressed by the interested parties, the commissioner, or the circuit court. Generally speaking, we will not address issues not raised and argued by the parties. *See Waushara Cnty. v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992). However, because we view this to be a threshold issue, and because addressing the topic will clarify the law, we choose to address it.

¶ 49. Based on our reading of the commissioner's brief on appeal, the commissioner understands Wis. Stat. § 645.68 to apply to rehabilitation proceedings. Although we give great weight deference to the commissioner's construction and application of the statutes it is charged with administering and enforcing, we conclude that there is no reasonable construction of the statute upon which we could conclude that § 645.68 applies to rehabilitation proceedings.[7]

---

[7] We observe that Article 2 of the rehabilitation plan, concerning the treatment of claims generally, organizes claims

¶ 50. Statutory interpretation "begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting another source). "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46.

¶ 51. We begin with the organization of Wis. Stat. ch. 645, the statutory scheme for insurer rehabilitation and liquidation. Subchapter III of this chapter governs formal insurer delinquency proceedings. This subchapter is divided into two sections: the first governing rehabilitation proceedings and the second governing liquidation proceedings. The statutory scheme governing rehabilitation is clearly set forth, starting at Wis. Stat. § 645.31 and ending at Wis. Stat. § 645.35. Except as otherwise provided by statute, the remainder of the subchapter provides the statutory scheme that pertains specifically to insurer liquidation. *See generally*, Wis. Stat. §§ 645.41–645.77.

¶ 52. Turning to the language of Wis. Stat. § 645.68 itself, we observe that the statute makes specific references to liquidation and no similar refer-

into three categories and prioritizes them as follows: (1) administrative claims; (2) policy claims; and (3) general claims. Our conclusion that Wis. Stat. § 645.68 applies only to liquidation proceedings does not negate the priority scheme set forth under the plan. Although, as we conclude, the commissioner was not required to follow the priority structure set forth in § 645.68, nothing prevents the commissioner from creating a plan that includes a priority scheme, as the commissioner did here.

ences to rehabilitation. For example, § 645.68(1) concerns the distribution of the costs and expenses of administration and provides that administration costs include "compensation for all services rendered in the *liquidation* . . . ." (Emphasis added.) This subsection does not provide for compensation for services rendered in rehabilitation. Additionally, § 645.68(6), which governs the distribution of claims based solely on judgments, states in relevant part that, claims based "both on the judgment and on the underlying facts . . . shall be considered by the *liquidator* . . . ." (Emphasis added.) It is clear from the statute's explicit references to liquidation, and the absence of any reference to rehabilitation, that § 645.68 applies only to liquidation proceedings.

¶ 53. Turning to the statutes closely surrounding WIS. STAT. § 645.68, we observe that § 645.68 falls within that part of the liquidation statutory scheme governing claims. The statutes governing claims in liquidation proceedings start at WIS. STAT. § 645.61, concerning the filing of claims with the liquidator, and end at WIS. STAT. § 645.71, concerning the liquidator's recommendations to the court as to which claims to approve. It is plain by the language of these statutes that they apply only in liquidation proceedings. There is no language in any of these statutes from which it can be reasonably inferred that these statutes apply in rehabilitation proceedings.

¶ 54. An examination of the statutes surrounding the part of the liquidation statutory scheme governing claims further demonstrates that WIS. STAT. § 645.68 applies only to liquidation proceedings. These statutes address numerous topics that are relevant only in the context of insurer liquidation, such as: (1) "Powers of liquidator" (WIS. STAT. § 645.46); (2) "Actions by and against liquidator" (WIS. STAT. § 645.49); (3) "Reopening

liquidation" (WIS. STAT. § 645.75); and (4) "Disposition of records during and after termination of liquidation" (WIS. STAT. § 645.76). Plainly, none of these topics have any application to rehabilitation proceedings.

¶ 55. Our construction of WIS. STAT. § 645.68 is supported by the introductory comment to § 645.68 that is found in 1967 Wis. Laws, ch. 89, which created WIS. STAT. ch. 645. The comment states in relevant part:

> When an insurer must be *liquidated*, the outcome is often tragic . . . . It becomes apparent that claims that are socially more important need to be paid ahead of those that are less important . . . .
>
> In an effort to minimize the harm done by *liquidation*, and especially to lessen it for those persons least able to bear it, much thought and consultation went into the structuring of the priority system.

Introductory comment to WIS. STAT. § 645.68, 1967 Wis. Laws, ch. 89, § 17 (emphasis added). The absence of any language in the above comment regarding rehabilitation is further evidence that the priority system applies only to liquidations.

¶ 56. Our construction is further supported by the comments to the subchapter at issue. The preliminary comments provide in relevant part:

> *Preliminary comment on rehabilitation* (ss. 645.31 to 645.35): In statutes dealing with insurers, it is traditional to provide for separate rehabilitation and liquidation procedures. This chapter continues that pattern.

Preliminary comment to Subchapter III, Formal Proceedings, 1967 Wis. Laws, ch. 89, § 17.

¶ 57. We also observe that the application of WIS. STAT. § 645.68 to rehabilitation proceedings would be contrary to principles of statutory construction because

579

it would produce an unreasonable result. *See Kalal*, 271 Wis. 2d 633, ¶ 46. As we have explained, the entire purpose of rehabilitation proceedings is to "reform and revitalize" the insurer. Wis. STAT. § 645.33(2). In light of that purpose, rehabilitation proceedings should "emphasize flexibility and informality" and "should be provided without cumbersome procedures." Introductory comment to Wis. STAT. § 645.32, 1967 Wis. Laws, ch. 89, § 17. The priority system set forth in § 645.68 provides inflexible and cumbersome rules concerning the order of distribution of claims, and therefore, requiring the application of § 645.68 to insurer rehabilitation would be contrary to the stated purpose of rehabilitation proceedings.

¶ 58. Applying well-established principles of statutory construction, we conclude that Wis. STAT. § 645.68 cannot be reasonably interpreted to apply to insurer rehabilitation proceedings.[8] Consequently, we do not address the interested parties' argument that the rehabilitation plan violates § 645.68.

 D. Right to Opt Out and Liquidation Value of Claims

¶ 59. The interested parties contend that the circuit court erred in approving the rehabilitation plan because it fails to provide policyholders "at least the liquidation value of their claims," or, alternatively, "the right to opt out of the plan and receive the liquidation

---

[8] The Customer Asset Protection Company (CAPCO) argues in its individual brief that the language of Wis. STAT. § 645.68 requires that a reinsurance contract be treated as a loss claim under § 645.68(3) and not as a residual claim under § 645.68(5). Because we conclude that § 645.68 does not apply to rehabilitation proceedings, we do not reach that argument.

value of their claims." In support of their argument, the interested parties cite *Neblett v. Carpenter*, 305 U.S. 297, 305 (1938), where, according to the interested parties, the United States Supreme Court held that an unconstitutional taking of property occurs when a rehabilitation plan fails to provide policyholders with the liquidation value of their claims or the right to opt out and receive what they would have in a liquidation.

¶ 60. The commissioner argues that neither *Neblett* nor any other case provides that rehabilitation plans must afford policyholders the liquidation value of their claims or the right to opt out of the rehabilitation plan and receive the liquidation value of their claims. The commissioner takes the position that, although an insurance commissioner may choose to structure a rehabilitation plan in that way in the proper exercise of its discretion, the commissioner is not required to include such provisions in a rehabilitation plan. We agree with the commissioner.[9]

¶ 61. Because the interested parties' arguments strongly rely on *Neblett*, we discuss the case in some detail. *Neblett* arose out of an insurance rehabilitation proceeding in California. The validity of the rehabilitation plan at issue was addressed first by the California supreme court in *Carpenter v. Pacific Mutual Life Ins. Co.*, 10 Cal. 2d 307, 74 P.2d 761 (1937). The pertinent facts are as follows. Pacific Mutual Life Insurance Company, a corporation engaged in the business of life, health, and accident insurance, became insolvent after

---

[9] Because we reject the interested parties' argument that they are entitled to the liquidated value of their claims or the right to opt out of the plan and receive the liquidated value of their claims, we need not address whether the liquidation analysis establishes that policyholders will receive the liquidated value of their claims under the plan.

charging insufficient premiums for non-cancelable accident and health policies. *Id.* at 314–15. The state insurance commissioner proposed a rehabilitation plan to prevent the losses caused by those policies from spreading to the life insurance portion of the company's business and thereby forcing the entire company into liquidation. *Id.* at 315–16. Relevant here, the rehabilitation plan provided for the creation of a new company, which restructured the policies in a way that reduced the benefits provided to holders of non-cancelable accident and health policies, but left unchanged the benefits provided to holders of life insurance policies. *Id.* at 316–17. Under the plan, the non-cancelable policyholders were given the option to adopt or opt out of the plan, and those who opted out of the plan received the equivalent of what they would receive upon liquidation. *Id.* at 321–22. The trial court approved the plan. *Id.* at 322.

¶ 62. Appellants, three of whom owned non-cancelable health and accident policies, argued in *Carpenter* that the plan constituted an unconstitutional taking of property, unlawfully impaired their contractual rights, and unlawfully discriminated against holders of non-cancelable accident and health policies by treating them less favorably than holders of life insurance policies. *Id.* at 329. The California supreme court rejected these arguments.

¶ 63. On certiorari review to the United States Supreme Court, the appellants renewed their arguments made before the California supreme court. In *Neblett*, the Supreme Court rejected the appellants' arguments and concluded that they failed to show there was an unconstitutional taking of property because there is "no constitutional right to a particular form of remedy" and they were "afforded an alternative whereby they will receive damages for breach of their contracts." *Neblett*, 305 U.S.

at 305. The Supreme Court also concluded that an unlawful impairment of contract did not arise from the less favorable treatment of holders of non-cancelable accident and health policies because policyholders who rejected the plan were provided with an appropriate remedy—the option to opt out of the plan on terms at least as favorable as they would receive from a complete liquidation of the company. *Id.* We now turn to address the merits of the arguments made by the interested parties.

¶ 64. As we have indicated, the interested parties contend that the United States Supreme Court in *Neblett* established a per se rule requiring rehabilitation plans to grant policyholders the right to receive, at a minimum, the liquidation value of their claims or "the right to opt out of the plan and receive the liquidation value of their claims."

¶ 65. We find no support in *Neblett* for the interested parties' contention that a rehabilitation plan is invalid as a matter of law unless policyholders are given the option to opt out and receive at least the liquidation value of their claims. Stated differently, we do not read *Neblett* as establishing "the broad principle that a rehabilitation plan is *per se* invalid unless every policyholder will fare as well in rehabilitation as in liquidation." *Consedine v. Penn Treaty Network Am. Ins. Co.*, 63 A.3d 368, 453 (Pa. Commw. Ct. 2012). Rather, the Supreme Court's focus in *Neblett* was on whether the rehabilitation plan at issue in that case was invalid. As we indicated, the Court rejected the appellants' argument that the plan impermissibly treated some policyholders more favorably than others, on the ground that all policyholders had the option to opt out of the plan and receive the liquidation value of their claims. *Neblett*, 305

U.S. at 304–05. Thus, the Supreme Court was responding to a specific argument made by the appellants and was not purporting to establish a rule that a rehabilitation plan is per se invalid unless, similar to the plan at issue in *Neblett*, it permits policyholders to receive the liquidation value of their claims or the right to opt out of the plan.

¶ 66. The interested parties cite several cases in support of their contention that "courts are in agreement that policyholders must be able to opt out and receive at least the liquidation value of their claims, or receive liquidation value in the rehabilitation." However, none of these cases advances the interested parties' position.

¶ 67. The interested parties cite *Commercial National Bank v. Superior Court*, 14 Cal. App. 4th 393, 398, 17 Cal. Rptr. 2d 884 (1993), where the court rejected a rehabilitation plan on the ground that it did not "satisfy the *Carpenter* standard." However, the "*Carpenter* standard" that the court was referring to was the requirement that rehabilitation plans be reasonably related to the public interest and not arbitrary or improperly discriminatory. *See id.* The court did not refer to or discuss *Carpenter* for the principle that rehabilitation plans must afford policyholders the liquidation value of their claims, or the right to opt out of the plan and receive the liquidation value of their claims.

¶ 68. The interested parties also cite to *Foster*, 614 A.2d at 1093–94, in which the Pennsylvania supreme court stated that "under *Neblett*, creditors must fare at least as well under a rehabilitation plan as they would under a liquidation." However, that statement was made in response to specific arguments raised that are unrelated to the issue we are addressing here and no legal analysis was conducted on the topic. In any event, we are not bound to adopt that court's construction of *Neblett*.

*See State v. Muckerheide*, 2007 WI 5, ¶ 7, 298 Wis. 2d 553, 725 N.W.2d 930 ("Although a Wisconsin court may consider case law from such other jurisdictions, obviously such case law is not binding precedent in Wisconsin, and a Wisconsin court is not required to follow it.").

¶ 69. Moreover, Wisconsin's rehabilitation statutory scheme does not require that policyholders fare as well in rehabilitation as they would in liquidation. The rehabilitation statutory scheme provides the commissioner with minimal guidance as to how to structure a rehabilitation plan and certainly no requirement that each plan must provide policyholders the liquidation value of their claims, or the right to opt out and receive the liquidation value of their claims. Rather, as we have explained thus far, WIS. STAT. ch. 645 demonstrates the legislature's clear and unequivocal intent to maximize the commissioner's flexibility in formulating a rehabilitation plan tailored to the circumstances of the particular case, which in this case may mean that not all policyholders are treated the same as they would be in liquidation. *See* Introductory comment to WIS. STAT. § 645.32, 1967 Wis. Laws, ch. 89, § 17.

¶ 70. For all of the above reasons, we reject the interested parties' argument that the rehabilitation plan is unlawful because it does not provide policyholders with the liquidation value of their claims or, in the alternative, the right to opt out of the plan and receive the liquidation value of their claims.

E. Impermissible Liquidation

¶ 71. The interested parties next challenge the rehabilitation plan on the ground that it is a "de facto liquidation" and not a rehabilitation. In support, the

interested parties maintain that the segregated account is insolvent and that the commissioner does not intend to infuse new capital into the segregated account. Instead, as the interested parties explain, the commissioner intends to conduct an "orderly run-off . . . of the liabilities allocated to the Segregated Account" and to terminate the account thereafter. Based on the above grounds, the interested parties argue that the plan is contrary to one of the stated purposes of the rehabilitation statutes, which is to "reform and revitalize" the insurer to the point where it is no longer insolvent. WIS. STAT. § 645.33(2). We view this argument as an attack on the commissioner's discretionary authority to fashion a rehabilitation plan that effectuates the purposes of the delinquency statutes in general, and the rehabilitation statutory scheme in particular. We are not persuaded.

¶ 72. Turning first to the interested parties' argument that the rehabilitation plan is a de facto liquidation because the segregated account is insolvent, we have already addressed and rejected that argument. As we have explained, the segregated account is adequately capitalized by the secured note and the reinsurance agreement, which provide policyholders in the segregated account on-demand access to the assets held in the general account.

¶ 73. We also understand the interested parties to be arguing that the commissioner's stated intent to run-off the liabilities in the segregated account and terminate the account thereafter is contrary to the purposes of rehabilitation. Their argument is too narrow in focus because it does not take into consideration the overall purpose of the rehabilitation, which, as we have discussed, is to reform and revitalize Ambac for the benefit of all policyholders, including the policy-

586

holders in the segregated account. Although the segregated account is a separate insurer for purposes of the rehabilitation, *see* WIS. STAT. § 611.24(3)(e), the segregated account is in actuality a part of Ambac and therefore what is in the best interests of Ambac as a whole is also in the best interests of the policyholders in the segregated account. As the commissioner has explained, the creation of the segregated account and the decision to pursue a targeted partial rehabilitation is in the best interests of segregated account policyholders because it protects Ambac's claims-paying resources from the contractual default triggers that likely would have resulted in Ambac's financial collapse.

¶ 74. We acknowledge that the commissioner was creative in its approach, whereby the commissioner transferred Ambac's liabilities into a segregated account and then pursued a targeted partial rehabilitation of the segregated account. The approach adopted by the commissioner here differs from the approach used by insurance commissioners in other cases where the *assets* of the company were transferred to a new company. *See Carpenter*, 10 Cal. 2d at 332 ("[I]n working out a plan of rehabilitation a new corporation [may] be formed to receive the assets of the old."). The approach here also differs from the approach taken in prior insurance delinquency proceedings in Wisconsin where the commissioner "commenc[ed] rehabilitation of the insurer as a whole, then creat[ed] a segregated account" and "mov[ed] [the segregated account] out of rehabilitation to carry on a part of the insurer's business." Here, in contrast to the plans described above, the commissioner placed the liabilities and not the assets in the segregated account and pursued a targeted partial rehabilitation of the segregated account. However, the interested parties have not shown that the

587

decision to place Ambac's liabilities in a segregated account was contrary to law or to the interests of the policyholders in the segregated account. *See* WIS. STAT. § 611.24(2) ("The commissioner shall approve [a corporation's decision to establish a segregated account] unless he or she finds that the segregated account would be contrary to the law or the interests of any class of insureds.").

¶ 75. We are not persuaded by the interested parties' apparent contention that the decision to run-off the liabilities in the segregated account and not to infuse capital into the segregated account is tantamount to a liquidation of the insurer. We provide two reasons why the interested parties have not demonstrated that the plan is actually a liquidation rather than a rehabilitation.

¶ 76. First, although the commissioner's stated intent is to run-off the liabilities in the segregated account, we have explained that segregated account claims will be satisfied partly in cash and partly in surplus notes. Whether policyholders in the segregated account will receive the full cash value of their claims remains to be seen. However, two points are worth mentioning, namely, that the market may improve to a degree that the claims may be substantially if not fully paid in cash in due time; and second, that "the exigencies attendant to a major commercial insolvency and the goals of rehabilitation necessitate the reality that 'individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public.' " *Foster*, 614 A.2d at 1094 (quoting another source).

¶ 77. Second, the evidence the interested parties rely on in arguing that the plan is in essence a liquidation fails to show that it is no longer possible to preserve

the business of Ambac. In Wisconsin, rehabilitation is properly pursued "whenever [the commissioner] believes that the insurer may be successfully rehabilitated without substantial increase in the risk of loss to creditors of the insurer or to the public." Wis. Stat. § 645.31(1); *see also Carpenter*, 10 Cal. 2d at 329 ("'The public has a grave and important interest in preserving the business if that is possible. Liquidation is the last resort."). The record before us demonstrates that it remains possible to preserve Ambac's business, which ultimately is in the best interests of all involved, including those whose policies have been allocated to the segregated account.

¶ 78. In sum, we conclude that the commissioner properly exercised its discretion in pursuing a targeted partial rehabilitation and that the interested parties have not shown that the rehabilitation plan is more properly characterized as a liquidation rather than a rehabilitation.

F. Unlawful Transfer of Assets

¶ 79. The interested parties argue that the rehabilitation plan separates "valuable assets" from the liabilities allocated to the segregated account, in violation of Wis. Stat. § 611.24(3)(b). They also argue that the plan transfers assets from the segregated account to the general account without "fair consideration," in violation of § 611.24(3)(h). We disagree with both arguments.

¶ 80. To the extent that the interested parties are reframing their arguments that the segregated account is inadequately capitalized because it contains only liabilities and no assets, and that the segregated account is unlawful because only a portion of the segre-

589

gated account claims are paid in cash, we do not reconsider those arguments here.

¶ 81. Turning to the interested parties' argument that the plan violates WIS. STAT. § 611.24(3)(b), we begin by considering the language of the statute, which provides in relevant part:

> The income and assets attributable to a segregated account shall always remain identifiable with the particular account but unless the commissioner so orders, the assets need not be kept physically separate from other assets of the corporation.

We understand the interested parties to argue that the plan violates § 611.24(3)(b) because assets attributable to the segregated account are kept in the general account and thus do not remain "identifiable" with the segregated account. However, the interested parties provide no reason why keeping assets in the general account means that those assets are no longer identifiable with the segregated account. As the language of the statute makes clear, the assets attributable to the segregated account need not be kept physically separate from the assets attributable to the general account.

¶ 82. In any event, as we have already explained, the commissioner had sound reasons for keeping the assets attributable to the segregated account in the general account. It was imperative, according to the commissioner, that all assets remain in the general account because transferring the assets to the segregated account would have triggered acceleration and early termination provisions, causing massive losses that would have made it substantially more difficult if not impossible to save Ambac from insolvency. The

commissioner should pursue rehabilitation as opposed to liquidation whenever possible and structuring the plan in a way that likely would have prevented the commissioner from pursuing rehabilitation would not be in keeping with that general principle. *See Carpenter*, 10 Cal. 2d at 329.

¶ 83. The interested parties also contend that the plan violates Wis. Stat. § 611.24(3)(h), which provides in full:

> *Transfer.* The corporation may by an identifiable act transfer assets for fair consideration among the segregated accounts, the general account and any trust accounts of the corporation.

The interested parties argue that the plan violates § 611.24(3)(h) because Ambac "failed to prove it provided any compensation for [the transfer of] assets, let alone the 'fair consideration' required by" the statute.

¶ 84. We conclude that the statute does not apply here because, as the interested parties concede, it is the liabilities that are being transferred to the segregated account and not the assets. The interested parties state that under the plan the "income and other assets associated with [the segregated account] policies, including future premium payments and subrogation recoveries, *remain* with the [g]eneral [a]ccount," and therefore the interested parties implicitly concede that the assets have always resided in the general account and have never been transferred to another account. (Emphasis added.)

¶ 85. Moreover, even if there had been a transfer of assets under the plan, the interested parties have not developed an argument as to why any alleged transfer

of assets was not for fair consideration or in what form that consideration would take, particularly given that the segregated account has on-demand use of all of the assets held in the general account.

## G. Made Whole Doctrine

¶ 86. The interested parties contend that the circuit court "erred in approving Section 4.04(h) of the [rehabilitation] [p]lan" because it violates Wisconsin's made whole doctrine and "leads to inequitable results."[10] Section 4.04(h) of the plan states:

> **(h) Assignment of Rights.** Without prejudice to (i) the terms and provisions of the applicable Policy and any related underlying instrument(s) or contract(s) and (ii) any assignment previously executed, whether pursuant to a Proof of Policy Claim Form or otherwise, upon receipt of a payment with respect to a Permitted Policy Claim, each such Holder shall be deemed to have assigned its rights relating to that payment under the underlying instrument(s) or contract(s) to [Ambac].

We review the circuit court's approval of Section 4.04(h) of the plan for an erroneous exercise of discretion.

---

[10] We note that similar challenges are raised in several of the individual briefs to Section 4.04(g) of the plan, which provides in relevant part that Ambac "shall be entitled to recover the full amount of all recoveries, reimbursements and other payments and to receive any assets it is owed in its capacity as insurer . . . ." Because the challenges raised in the individual briefs to Section 4.04(g) of the plan substantially overlap with the challenges raised in the consolidated brief to Section 4.04(h) of the plan, and we conclude that there is no merit to the challenges presented in the consolidated brief, we do not separately address the challenges raised in the individual briefs.

¶ 87. The interested parties take the position that Section 4.04(h) of the plan violates the made whole doctrine because "it requires policyholders to assign their contractual rights to [Ambac] *before* they are fully compensated for their losses." In an overlapping argument, the interested parties argue they were not fully compensated for their losses before assigning their contractual rights to Ambac under Section 4.04(h) of the plan because, in exchange for the assignment of those rights, they received surplus notes that are worth only "cents on the dollar." The interested parties contend that "[p]ayment of cents on the dollar, by definition, does not allow a policyholder to be 'fully compensated for his or her losses,' " as required under the made whole doctrine.

¶ 88. In response, the commissioner argues that the interested parties have failed to show that the made whole doctrine applies in the rehabilitation context. In their reply brief, the interested parties assert that the made whole doctrine should apply because the commissioner has not provided a reason why the doctrine could not be applied in the rehabilitation context.

¶ 89. As the party advancing the claim, the interested parties carry the burden of showing that the made whole doctrine applies to rehabilitation proceedings. They have not met their burden.

■■ ■■

¶ 90. The made whole doctrine is ill-suited for these proceedings. Under the made whole doctrine, "an insured must be made whole before the insurer may exercise subrogation rights against its insured." *Ruckel v. Gassner*, 2002 WI 67, ¶ 4, 253 Wis. 2d 280, 646 N.W.2d 11. However, as we have indicated, the purpose of rehabilitation proceedings is not to make each policyholder whole but to apportion unavoidable losses in a

manner that is fair and equitable to policyholders, creditors, and the public in general. *See* WIS. STAT. § 645.01(4)(d). It makes no sense to apply the doctrine in the context of rehabilitating an insurer, particularly under the specific facts of this case, because in order to maximize claims-paying resources, it may be essential, as is the case here, that policyholders assign subrogation rights to the insurer before they have been made whole.

■■■■

¶ 91. Moreover, it is axiomatic that the commissioner, in the reasonable exercise of the state's police power, may structure a rehabilitation plan that has the potential to adversely affect the interests of individual policyholders when the plan advances the broader interests of the policyholders, the creditors, and the public as a whole. *See American Eagle Ins. Co. v. Wisconsin Ins. Sec. Fund,* 2005 WI App 177, ¶ 37, 286 Wis. 2d 689, 704 N.W.2d 44 (the State may exercise the powers vested in it for the general good of the public even when doing so has the potential to impair contracts); *see also Caminetti v. Pacific Mut. Life Ins. Co.,* 22 Cal. 2d 344, 361, 139 P.2d 908 (1943) ("[T]he power of the commissioner with respect to statutory proceedings against insolvent or delinquent insurers is of general public concern.").

¶ 92. In a separate argument, the interested parties complain that Section 4.04(h) "leads to inequitable results." The interested parties argue that the provision "deprives them of the benefit of the bargain they struck" with Ambac by "shifting loss from [Ambac], which received and continues to receive a substantial premium to assume that loss, to the policyholders in the Segregated Account, who paid [Ambac] to protect against loss."

¶ 93. In response, the commissioner maintains that Section 4.04(h) of the rehabilitation plan does not lead to inequitable results because Ambac's exercise of subrogation rights has the effect of maximizing claims-paying resources to the benefit of all policyholders. The commissioner acknowledges the "theoretical possibility" that Section 4.04(h) might cause "an unfair result in isolated future situations." However, the commissioner asserts that, in those "unlikely circumstances" where the application of that provision leads to inequitable results, the commissioner will attempt to work out an alternative resolution with the policyholder under Section 3.06 of the plan.[11] In approving the plan, the circuit court found that:

> If any inequitable situations arise in the future with regard to recoveries, it is [the commissioner's] intent to work out efficient solutions with policyholder trustees for fair allocation of such recoveries . . . . Article 3.06 of the Plan provides a mechanism for doing so.

We are satisfied that the commissioner and the circuit court reasonably determined that, to the extent that Section 4.04(h) may lead to inequitable results, the plan contains adequate provisions to address those situations.

¶ 94. Finally, the interested parties argue that Section 4.04(h) may lead to inequitable results because

---

[11] Section 3.06 of the plan, titled "Alternative Resolutions of Claims," states in relevant part:

Nothing in this Plan shall limit the ability of the Rehabilitator to resolve any Claim through the arrangement, negotiation, effectuation and execution of an amendment, restructuring, refinancing, purchase, repurchase, termination, settlement . . . or any similar transaction that results in the extinguishment or reduction of the Segregated Account's liability . . . .

any amount that Ambac recovers through the exercise of its subrogation rights will be allocated to the general account and not "reinvested back into the Segregated Account." We view the interested parties' equity arguments as simply an attempt to reframe their earlier attack on the capitalization of the segregated account. As we have already explained, the commissioner had valid reasons for keeping recoveries in the general account, namely, to prevent the triggering of additional claims and the creation of additional demands on the resources available to pay claims, which would have jeopardized the interests of policyholders in both the general account and segregated account. The interested parties fail to explain why the capitalization structure chosen by the commissioner, after substantial consultation with experts in the insurance and financial industries, is inequitable in the context of the entire rehabilitation plan. Accordingly, we conclude that the circuit court properly exercised its discretion in approving Section 4.04(h) of the rehabilitation plan.

H. Immunity, Indemnification, and Injunction Provisions

¶ 95. The interested parties contend that the commissioner exceeded its authority under the rehabilitation statutes by including immunity and indemnity provisions in the rehabilitation plan that confer greater protections than permitted under Wis. Stat. § 645.08(2) and the official comments to Wis. Stat. § 645.34(1). The specific provisions at issue are Sections 8.01, 9.01, and 9.02 of the rehabilitation plan.[12] We understand the

[12] Section 8.01 concerns discharges, releases, and injunctions. It provides in relevant part:

> Other than as expressly provided for in this Plan, all Holders of Claims are precluded from asserting against the Segregated Account, the General Account or AAC, or their respective successors

interested parties to be arguing that any person or entity not listed in § 645.08(2) as being protected from

> or property or any of their respective current or former members, ... any Claims, obligations, rights, causes of action or liabilities, based upon any act, omission, transaction, or other activity of any kind or nature, made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan (and the Confirmation Order related thereto), the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, other than claims of intentional fraud or willful misconduct.

Section 9.01 lists the beneficiaries of the immunity and indemnification protections. It states in relevant part:

> The following Persons are entitled to protection under this part of this Plan: OCI, the Rehabilitator, the Special Deputy Commissioner, the Segregated Account, AAC and the General Account, and the Management Services Provider, and each of their respective current and former members, shareholders, affiliates, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, consultants and ... any other advisors or experts with whom OCI, the Rehabilitator or the Special Deputy Commissioner consults, as contemplated by Wis. Stat. § 645.33(3)).

Section 9.02 sets forth the scope of the immunity and indemnification protections. It provides in relevant part:

> All Persons identified in Section 9.01 shall have official immunity and shall be immune from suit and liability, both personally and in their official capacities, for any act or omission made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan ... or the administration of this Plan ... with the sole exception of acts or omissions resulting from intentional fraud or willful misconduct as determined by a Final Order .... If any legal action is commenced against any Person identified in Section 9.01 ... caused by or resulting from any act or omission made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan ... or the administration of this Plan or the property to be distributed under this Plan, that Person shall be indemnified by the Segregated Account for all expenses, ... unless it is determined by a Final Order that the alleged act or omission was caused by intentional fraud or willful misconduct.

civil liability, cannot be protected by the immunity and indemnification provisions under the rehabilitation plan, including "AAC, its affiliates, management, and parent corporation." In addition, the interested parties read the immunity and indemnification provisions in the plan as applying "to all claims not expressly provided for in the Plan," and contend that § 645.08(2) "permits a release only for acts or omissions in the course of duties conducted pursuant to" WIS. STAT. ch. 645. We also understand the interested parties to be arguing that the immunity and indemnification provisions provide greater protections than permitted because the official comments to § 645.34(1) provide that the commissioner "should not be permitted to escape actions and proceedings instituted against the insurer," and, according to the interested parties, the plan allows the commissioner to do so. Comment to WIS. STAT. § 645.34(1), 1967 Wis. Laws, ch. 89, § 17. We reject the interested parties' arguments.

¶ 96. We address first the interested parties' arguments pertaining to WIS. STAT. § 645.08(2). The statute provides in pertinent part:

> No civil cause of action may arise against and no civil liability may be imposed upon the state, commissioner, special deputy commissioner, rehabilitator or liquidator, or their employees or agents . . . for an act or omission by any of them in the performance of their powers and duties under this chapter . . . . This subsection does not apply to a civil cause of action arising from an act or omission that is criminal under ch. 943.

WIS. STAT. § 645.08(2).

¶ 97. We reject the interested parties' construction of WIS. STAT. § 645.08(2) as barring a rehabilitation

plan from extending immunity to individuals and entities not listed in the statute. We find no such limiting language in the statute. In addition, the interested parties' construction of the statute would not be in keeping with the flexibility and broad discretion WIS. STAT. ch. 645 confers on the commissioner in fashioning an effective rehabilitation plan. As the commissioner explains in its brief on appeal, the immunity and indemnification provisions are necessary to protect the entities that the commissioner has selected to carry out the rehabilitation plan. This is a necessary and laudable goal. It is incumbent on the commissioner to protect these entities and individuals from the threat of civil liability arising out of actions taken in carrying out the rehabilitation plan. Without extending such protection, it is hard to imagine who or what entity would be willing to expose itself to civil liability when the government calls upon it to assist in the rehabilitation of an insurer.

¶ 98. The circuit court made the following finding to this effect:

> The Plan provisions providing certain civil immunities to those responsible for administering the Plan, including the management services provider [Ambac], are necessary to facilitate frank and open assessment and advice from individuals charged with administering the Plan, with the assurance that their views and expertise will not lead to civil liability.

The interested parties do not challenge the court's finding or explain why the commissioner lacked a rational basis to extend immunity and indemnification protections to individuals and entities not identified in WIS. STAT. § 645.08(2).

¶ 99. In addition, the interested parties ignore that WIS. STAT. § 645.08(2) extends immunity and indemnification to "agents" of the "commissioner, the special deputy commissioner, and of the rehabilitator." Here, Section 9.01 of the rehabilitation plan provides immunity and indemnification protections to certain agents of the commissioner, including "attorneys, financial advisors, investment bankers, consultants and any other advisors or experts." The interested parties do not explain why individuals acting in their capacity as agents do not fall under the protections of § 645.08(2).

¶ 100. The interested parties also misconstrue the immunity and indemnification provisions as applying "to all claims not expressly provided for in the Plan." The plain language in Articles 8 and 9 of the plan expressly limits the application of the immunity and indemnification provisions to claims "based upon any act, omission, transaction, or other activity of any kind or nature, made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan . . . or the administration of this Plan." We do not agree with the interested parties that these provisions are so sweeping in scope as to be unlawful under Wisconsin law. To the contrary, these provisions apply only to acts taken to carry out the rehabilitation plan. We conclude that the commissioner properly exercised its discretion in protecting the entities and individuals involved in this very complicated task of reforming and revitalizing Ambac.

¶ 101. The interested parties also contend that the immunity and indemnification provisions in the rehabilitation plan confer greater protections than permitted. The interested parties rely on the comment to

WIS. STAT. § 645.34(1),[13] which provides in relevant part:

> The rehabilitator should not be permitted to escape actions and proceedings instituted against the insurer—if he needs to do that the insurer should be liquidated, not rehabilitated—but he should be given time to reconsider strategy.

Comment to WIS. STAT. § 645.34(1), 1967 Wis. Laws, ch. 89, § 17. The interested parties point to no evidence demonstrating that the intent of the commissioner is to "escape actions and proceedings instituted against the insurer." Rather, as we have discussed, the stated intent of the commissioner is to protect those involved in carrying out the rehabilitation plan from civil liability. Moreover, as we explain more fully below, the circuit court is expressly authorized under WIS. STAT. § 645.05(1)(f) to enter an injunction to prevent "the institution or further prosecution of any actions or proceedings" during the administration of the rehabilitation plan.

¶ 102. In a separate argument, the interested parties contend that the injunction provisions in Section 8.01 of the rehabilitation plan are overbroad.

[13] WISCONSIN STAT. § 645.34(1) concerns stays in pending litigation. It states in relevant part:

On request of the rehabilitator, any court in this state before which any action or proceeding by or against an insurer is pending when a rehabilitation order against the insurer is entered shall stay the action or proceeding for such time as is necessary for the rehabilitator to obtain proper representation and prepare for further proceedings . . . . The rehabilitator shall immediately consider all litigation pending outside this state and shall petition the courts having jurisdiction over that litigation for stays whenever necessary to protect the estate of the insurer.

Specifically, the interested parties argue that the commissioner has not demonstrated that extending the injunction protection provisions to Ambac's parent company and other Ambac affiliates is necessary and proper to effectuate a successful rehabilitation. The interested parties also argue that the circuit court erred in approving Section 10.02 of the plan, which provides that the March 2010 temporary injunction will remain in effect throughout the administration of the plan. We reject these arguments.

¶ 103. We are satisfied that the court properly exercised its discretion in determining that the injunction is not overly broad and that the March 2010 temporary injunction should remain in effect throughout the administration of the plan. The circuit court has the power to take action to prevent persons or entities from jeopardizing the success of the insurance rehabilitation. For example, the court may grant a permanent injunction, as it did here, to prevent, among other things: (1) interference with the rehabilitation proceedings; (2) waste of the insurer's assets; (3) the institution of actions or proceedings; and (4) "threatened or contemplated action that might lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors, or shareholders, or the administration of the proceeding." WIS. STAT. § 645.05(1)(c), (d), (f), and (k). We conclude that the circuit court properly issued an injunction that is "necessary and proper" to prevent the institution of proceedings that may interfere with the insurance rehabilitation and waste or lessen the value of Ambac's assets, to the detriment of policyholders, creditors, and shareholders alike.[14] *See id.*

---

[14] The RMBS policyholders argue in their individual brief that Section 8.02 of the plan, which protects the trustees of

I. Discovery, Scheduling, and Admission of Evidence

¶ 104. The interested parties contend that the rehabilitation proceedings and plan approval hearing were fundamentally unfair and denied the interested parties their procedural due process rights under the Fourteenth Amendment to the United States Constitution on three grounds: (1) the circuit court did not permit the interested parties to conduct discovery; (2) the circuit court expedited the hearing on the approval of the plan to the detriment of the interested parties; and (3) the circuit court admitted the disclosure statement and liquidation analysis in violation of the rules of evidence prohibiting the admission of inadmissible hearsay. We address and reject each ground in turn.

¶ 105. Although the interested parties frame their arguments in the context of whether their due process rights have been violated, we understand the interested parties in essence to be challenging the

securitization trusts from civil liability for actions taken in carrying out the plan, violates WIS. STAT. § 645.08(2) because the trustees are not granted protections from civil liability under the statute. We reject that argument because, as we have concluded, § 645.08(2) does not prevent a rehabilitation plan from providing protections to individuals and entities not listed in the statute.

To the extent that the RMBS policyholders are also arguing that Section 8.02 of the rehabilitation plan is overbroad because it could be construed to unlawfully extinguish the claims they have against the trustees without their consent, we reject that argument. They cite to no legal authority standing for the proposition that a rehabilitation plan cannot provide protections to trustees without the policyholders' consent and, in any event, they concede that Section 8.02 provides protections only for acts taken in carrying out the plan.

circuit court's discretionary rulings. We affirm the court's rulings concerning discovery, scheduling, and the admission of evidence unless the court erroneously exercised its discretion. *See Vincent & Vincent, Inc. v. Spacek,* 102 Wis. 2d 266, 270, 306 N.W.2d 85 (Ct. App. 1981) (discovery decisions reviewed for erroneous exercise of discretion); *Estate of Kriefall v. Sizzler USA Franchise, Inc.,* 2011 WI App 101, ¶ 5, 335 Wis. 2d 151, 801 N.W.2d 781 (scheduling decisions reviewed for erroneous exercise of discretion); *Broadhead v. State Farm Mut. Auto. Ins. Co.,* 217 Wis. 2d 231, 245, 579 N.W.2d 761 (Ct. App. 1998) (admission of evidence reviewed for erroneous exercise of discretion). The circuit court properly exercises its discretion as long as it "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *State v. Walters,* 2004 WI 18, ¶ 14, 269 Wis. 2d 142, 675 N.W.2d 778.

1. Discovery

¶ 106. The interested parties made several requests to the circuit court at various times throughout the rehabilitation proceedings to conduct discovery, primarily in the context of motions to intervene. The circuit court denied their requests to conduct discovery because: the interested parties lacked standing as parties to seek discovery in this rehabilitation proceeding; there is no right to discovery in a rehabilitation proceeding; and the commissioner appropriately exercised its discretion in denying the interested parties' discovery requests.

¶ 107. The interested parties assert on appeal that, pursuant to Wis. Stat. § 804.01(2)(a), they were entitled to conduct discovery prior to the plan approval hearing. In what appears to be a separate argument, the inter-

ested parties argue that the circuit court denied their procedural due process right to a meaningful opportunity to be heard because they were not permitted to conduct discovery. They also contend that "national standards" governing rehabilitation proceedings "support permitting policyholders and other interested parties an opportunity to challenge a rehabilitation plan after discovery." We reject these arguments.

¶ 108. WISCONSIN STAT. § 804.01(2)(a)[15] governs the right of "[p]arties" to obtain discovery in civil actions. In arguing that they are entitled to discovery in this rehabilitation proceeding, the interested parties assume in their brief-in-chief that the discovery statute applies to them. They are wrong. The circuit court determined that the interested parties were not "parties" to this proceeding and denied their motions to intervene on that basis. On appeal, the interested parties do not challenge the circuit court's determination that they are not parties to these proceedings. This proves fatal to the interested parties' argument because § 804.01(2)(a) limits the right to discovery to "parties" and, as the circuit court correctly determined, the interested parties are not "parties" within the meaning of the statute. Because the interested parties are not parties within the meaning of the discovery statute, we conclude that the circuit court properly denied the interested parties' requests for discovery.

¶ 109. As we indicated, the interested parties also argue that their due process rights were violated because the circuit court denied their requests for discov-

---

[15] WISCONSIN STAT. § 804.01(2)(a) states in pertinent part: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ."

ery. The interested parties argue that, to satisfy due process requirements, the court must avail them a meaningful opportunity to be heard on the merits of the rehabilitation plan. *See Bunker v. LIRC*, 2002 WI App 216, ¶ 19, 257 Wis. 2d 255, 650 N.W.2d 864 ("The fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner."). They argue that, by denying them the right to discovery, they lacked sufficient time and information to evaluate the plan, which, in turn, denied them the right to be meaningfully heard. We disagree.

¶ 110. To the extent that the interested parties have a procedural due process right to be meaningfully heard, we conclude that the circuit court provided the interested parties with far more due process than what is required under Wisconsin's rehabilitation statutory scheme. *See State v. Hardwick*, 144 Wis. 2d 54, 58, 422 N.W.2d 922 (Ct. App. 1988) ("Due process is flexible and requires such procedural protections as the particular situation demands."). All that is required under WIS. STAT. § 645.33(5), is that notice be provided and a hearing held as prescribed by the circuit court. There is no dispute that the interested parties received notice and that a hearing was held on the rehabilitation petition.

¶ 111. As we indicated, the circuit court provided significantly more process to the interested parties than WIS. STAT. § 645.33(5) requires. The interested parties were given an opportunity prior to the plan approval hearing to file written objections to the proposed plan and to submit factual questions to the commissioner, to which the commissioner responded in advance of the hearing. At the plan approval hearing, the interested parties had the opportunity to present their own witnesses and to cross-examine the commissioner's witnesses. The interested parties called James Schacht, a

former Illinois insurance regulator, to testify at the hearing. Over the course of the five-day hearing, the interested parties thoroughly cross-examined the commissioner's witnesses, including Peterson, the commissioner's primary witness at the hearing. The commissioner also provided the interested parties with hundreds of pages of documents pertinent to the rehabilitation plan prior to the hearing. Thus, as we can see, the interested parties received far greater procedural protections than required in a rehabilitation proceeding and took full advantage of those opportunities.

¶ 112. We also reject the interested parties' claim that "national standards" governing rehabilitation proceedings support providing the interested parties with the opportunity to conduct discovery. Setting aside for the moment that we are unaware of any "national standards" governing discovery in rehabilitation proceedings, the interested parties are correct that case law from other jurisdictions demonstrates that circuit courts *may*, in the proper exercise of their discretion, allow interested parties to conduct discovery in rehabilitation proceedings. However, that does not mean that circuit courts are *required* to grant discovery rights to nonparties. Even the cases the interested parties point to in support of their contention that they have the right to conduct discovery in this rehabilitation proceeding supports the commissioner's position that the right to discovery is not mandatory, but rather left to the discretion of the circuit court. *See Grode v. Mutual Fire, Marine & Inland Ins. Co.*, 572 A.2d 798, 801–02 (Pa. Commw. Ct. 1990); *Carpenter*, 10 Cal. 2d at 321–22.

¶ 113. Finally, we agree with the circuit court that the interested parties are not entitled to discovery in this rehabilitation proceeding. We explained earlier that this

607

is a special proceeding under Wis. Stat. ch. 645. Generally, the rules of civil procedure "govern procedure and practice in circuit courts of this state in all civil actions and special proceedings . . . *except where different procedure is prescribed by statute or rule.*" Wis. Stat. § 801.01(2) (emphasis added). The rules of civil procedure, *including the rules pertaining to discovery, do not apply to rehabilitation proceedings* because ch. 645 prescribes its own rules of procedure in insurer delinquency proceedings. *See* Wis. Stat. § 645.33(5). The legislature did not intend to bind the court to the rules of civil procedure when applying these rules would transform an informal management task into a formal and cumbersome legal task. *See* Introductory comment to Wis. Stat. § 645.32, 1967 Wis. Laws, ch. 89, § 17.

¶ 114. Accordingly, for all of the above reasons, we conclude that the circuit court properly exercised its discretion in denying the interested parties' requests for discovery.

2. Hearing Schedule

■■■■

¶ 115. The interested parties next contend that they were denied due process when the court set an expedited plan approval hearing schedule that allegedly provided the interested parties with insufficient time to review the rehabilitation plan and the disclosure statement, and only one day to review the liquidation analysis. At the October 2010 scheduling hearing, the commissioner proposed a condensed schedule for matters leading up to the plan approval hearing. The interested parties opposed the commissioner's proposed schedule on the primary ground that the schedule did not provide them sufficient time to conduct discovery. We reject the interested parties' argument.

¶ 116. We note first that the only reason the interested parties provide as to why they needed additional time to prepare for the hearing was to conduct discovery. But the interested parties knew that the circuit court had previously ruled that the interested parties were not entitled to discovery. The interested parties fail to explain why they were entitled to additional time to prepare for the hearing, in light of the court's prior rulings denying their requests for discovery. As we have already concluded, the interested parties had no right to conduct discovery in this rehabilitation proceeding and therefore their contention that the court violated their due process rights by scheduling an expedited hearing lacks merit.

¶ 117. The interested parties also have not shown that they were prejudiced by the circuit court's decision to set an expedited hearing schedule. The interested parties contend that the commissioner requested an expedited hearing in an "attempt to gain a strategic advantage." The interested parties do not identify any evidence to support this assertion. In addition, the interested parties fail to cite to any authority that required the commissioner to disclose these documents prior to the plan approval hearing. As we have concluded above, the circuit court provided the interested parties with greater procedural due process rights than what is required under Wisconsin's rehabilitation statutory scheme. Accordingly, we conclude that the circuit court properly exercised its discretion in adopting the expedited hearing schedule proposed by the commissioner.

 3. Admission of Disclosure Statement and Liquidation Analysis

¶ 118. The interested parties contend that the circuit court erred in admitting the disclosure state-

ment and the liquidation analysis because they are inadmissible hearsay under the rules of evidence. The circuit court admitted the documents into evidence on the grounds that it had authority to take judicial notice of the documents and that the documents were admissible under the public records exception to the hearsay rule.

■■■

¶ 119. We do not address whether the grounds the circuit court relied on for admitting the documents were correct because we conclude, on alternate grounds, that the interested parties have not shown that the circuit court's ruling affected a substantial interest of a party to the proceeding. *See Correa v. Farmers Ins. Exch.*, 2010 WI App 171, ¶ 4, 330 Wis. 2d 682, 794 N.W.2d 259 ("[W]e may affirm a circuit court for any reason, even if not relied on by either the circuit court or raised by the lawyers.").

¶ 120. We focus our analysis on WIS. STAT. § 901.03, which "contains the provisions of the Rules of Evidence relating to objections and the review of errors made in the admission or exclusion of evidence." *Virgil v. State*, 84 Wis. 2d 166, 189, 267 N.W.2d 852 (1978). The statute states in relevant part:

> **(1)** EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence *unless a substantial right of the party is affected*; and
>
> (a) OBJECTION. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.

WIS. STAT. § 901.03(1)(a) (emphasis added).

¶ 121. Reasonably read, WIS. STAT. § 901.03(1) requires that the objector to the admission or exclusion of evidence be a "party" to the proceeding. This proves fatal to the interested parties' argument. As we have already concluded, the interested parties are not "parties" to this rehabilitation proceeding. Accordingly, they do not possess the right to object to the circuit court's admission of the challenged documents.

¶ 122. Moreover, even if the interested parties had been "parties" to the proceeding, the interested parties have not argued or shown that the admission of the challenged documents affected "a substantial right." The interested parties did not object to the admission of the challenged documents in the circuit court on the ground that their substantial rights were being affected by the admission of the documents, nor have they addressed the topic in their consolidated brief-on-appeal. To the extent that the interested parties may be contending that the admission of the documents violated their procedural due process rights, we have already concluded that the circuit court provided the interested parties with greater protections than required under the rehabilitation statutory scheme.

IV. Individual Briefs

¶ 123. We turn now to address the arguments raised in the individual briefs that were not addressed in the consolidated brief.

A. Allocation of Policies to the Segregated Account

██ ██

¶ 124. Various interested parties appear to be challenging the allocation of their respective policies to the segregated account. To the extent that the inter-

ested parties are challenging the commissioner's discretionary determinations about which policies to allocate to the segregated account, none of the interested parties dispute that the commissioner's decisions as to which policies to allocate to the segregated account were "consistent with [the commissioner's] objectives to narrowly tailor the [p]roceeding to preserve the financial stability provided by [Ambac] to its policyholders." Indeed, the commissioner worked closely with various experts for weeks to identify the policies or categories of policies that met the commissioner's criteria for allocation to the segregated account. In identifying these policies, the commissioner considered the broader interests of the policyholders, the creditors and the public in general, rather than the narrow interests of particular policyholders, as the interested parties insist the commissioner should do here. *See* Wis. Stat. § 645.01(4). "The Commissioner is best qualified to perform the rehabilitation . . . process as he has no special interest in the outcome except to administer the matter for the maximum benefit of all interested parties." *Minor v. Stephens*, 898 S.W.2d 71, 76 (Ky. 1995). Accordingly, the interested parties do not persuade us that the commissioner, in consultation with experts in the field, abused its discretion in determining which policies to allocate to the segregated account.[16]

---

[16] We note that the LVM bondholders argued in an earlier appeal that the allocation of the LVM bonds to the segregated account was discriminatory and in violation of the equal protection clauses of the United States and Wisconsin constitutions. In support, they cited to *Carpenter v. Pacific Mutual Life Ins. Co.*, 10 Cal. 2d 307, 335–37, 74 P.2d 761 (1937). The California supreme court determined that the rehabilitation plan at issue in that case was not unlawfully discriminatory because the difference in treatment between holders of noncancelable accident and health policies and the holders of life

## B. Long-Term Claimants

¶ 125. Wells Fargo Bank, N.A., as trustee for the LVM bondholders (LVM bondholders) and Eaton Vance argue that the provision in the rehabilitation plan, which provides that policyholders will receive 25% of their claims in cash and 75% in surplus notes, discriminates against the long-term policyholders to the benefit of the short-term policyholders. The effect of this provision, according to the LVM bondholders and Eaton Vance, is that, in the event that there are insufficient funds to pay all policyholders, the short-term policyholders will receive the 25% cash percentage, and the long-term policyholders will receive a smaller cash percentage, or no cash percentage at all. In essence, the LVM bondholders and Eaton Vance challenge the commissioner's exercise of discretion in its formulation of this provision of the rehabilitation plan. Once again, we are not persuaded.

¶ 126. The commissioner explains in its brief on appeal that the primary reason it commenced rehabilitation proceedings was to prevent short-term policy-

insurance policies was justified. *Carpenter*, 10 Cal. 2d at 336. The court explained that holders of non-cancelable accident and health policies were treated differently because they paid insufficient premiums, which caused the company's financial troubles, and the only way to preserve the company's business was to treat those policyholders differently from holders of life insurance policies. *Id.* at 336–37. Here, similar to *Carpenter*, allocating the LVM bonds to the segregated account maximizes the assets available to both the LVM bondholders and the holders of bonds held in the general account. It also represents the best opportunity to save Ambac from financial disaster. We find no equal protection violation in the allocation of the LVM bonds to the segregated account.

holders "from consuming a disproportionate share of Ambac's resources to the disadvantage of" long-term policyholders. According to the commissioner, it sought to "balance the competing demands" of the short-term policyholders with the long-term policyholders "in a way that was fair to both." In support of its claim on appeal that the plan fairly balances the competing interests of policyholders, the commissioner points to this finding made by the circuit court in approving the rehabilitation plan:

> The testimony at the hearing demonstrates that the Plan fairly balances and protects between the competing interests of policyholders with 'long-tail' interests and those having 'short-tail' interests. Certain of the objectors with 'short-tail' interests argued that the Plan is too conservative regarding the percentage of cash being distributed in early years; conversely, objectors with 'long-tail' interests argued that the Plan distributes cash too rapidly .... While neither extreme is satisfied by the intermediate balance struck by the Rehabilitator pursuant to the Plan, the Court finds that the balance struck by the Rehabilitator is fair and reasonable under the circumstances.

The interested parties do not claim that the court's finding is clearly erroneous.

¶ 127. Based on the above factual finding and the circuit court's rationale, generally speaking, we are satisfied that the circuit court properly determined that the commissioner acted reasonably in balancing the competing interests of short-term and long-term policyholders. We turn now to address and reject the specific arguments made by the LVM bondholders and Eaton Vance that the rehabilitation plan discriminates against long-term policyholders.

¶ 128. The LVM bondholders and Eaton Vance assert that the commissioner unlawfully discriminated against long-term policyholders because long-term policyholders and short-term policyholders are not treated equally with respect to the payment of permitted claims. The problem with this assertion is that nothing in the statutes requires that long-term policyholders be treated *equal* to the short-term policyholders. Although policyholders are to be treated *equitably* under WIS. STAT. § 645.01(4)(d), a policyholder may be treated equitably without being treated equally. The difference between "equitable" treatment and "equal" treatment is that equitable means fair treatment, whereas equal means the same treatment. *See* WEBSTER'S II NEW COLLEGE DICTIONARY 380–81 (1999). Thus, § 645.01(4)(d) does not require that all policyholders receive the same treatment.

¶ 129. The LVM bondholders and Eaton Vance next argue that the commissioner discriminated against long-term policyholders by formulating a rehabilitation plan that does not address whether claims that are expected to mature after the June 2020 scheduled maturity date will be paid. We understand the argument to be that the commissioner abused its discretion by failing to include in the plan any provisions regarding the treatment of claims expected to mature after June 2020. We reject this argument.

¶ 130. The LVM bondholders and Eaton Vance ignore two key provisions that advance the interests of long-term policyholders. First, the plan "allows for amendment between now and 2020 to adjust payments under the Surplus Notes" to prevent a situation where only the short-term policyholders receive an initial cash percentage. Second, the plan allows the commissioner

to "assess the need to modify [the June 2020 maturity] date to allow [for the] continuation or reissu[ance] of Surplus Notes after 2020." As is readily apparent from the above provisions, the commissioner contemplates determining at a later date whether to modify the scheduled maturity date and making adjustments where needed to protect the interests of policyholders who have claims expected to mature after the scheduled maturity date. This type of flexibility is key to protecting the interests of long-term policyholders. Although the plan does not guarantee that long-term policyholders will receive the initial cash percentage for their claims, the commissioner kept the initial cash percentage as low as it was to maximize the likelihood that there will be sufficient funds to pay the initial cash percentage to both short-term and long-term policyholders. We must defer to the commissioner's extensive experience and expertise in determining the best approach to protecting the interests of long-term policyholders.

¶ 131. The LVM bondholders next argue that the commissioner failed to take into account the "worst-case" scenario when establishing the initial 25% cash percentage. Rather, according to the LVM bondholders, the commissioner inexplicably considered only a "better-than-worst-case" financial scenario. We are not persuaded. The LVM bondholders once again ignore the broad discretion granted to the commissioner in formulating a rehabilitation plan and fail to explain, within the context of the entire plan, how not considering the "worst-case" scenario in establishing the 25% cash percentage was an abuse of discretion.[17] Moreover, the

---

[17] We do not address a related argument made by the LVM bondholders that the commissioner erred in failing to disclose the financial data underlying its determination to set the initial

LVM bondholders provide no legal authority suggesting that the commissioner was required to set the initial cash percentage based on a worst case scenario and therefore we do not further address this argument. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

██

¶ 132. Finally, the LVM bondholders and Eaton Vance contend that the commissioner discriminated against long-term policyholders by refusing to establish a cash reserve account to ensure there are sufficient funds for the payment of the initial cash percentage to long-term policyholders.

¶ 133. Eaton Vance takes the position that the commissioner was required to set aside funds for the payment of long-term policyholders based on federal bankruptcy case law holding that a plan of reorganization must include a reservation of sufficient funds to pay future claimants. Although we may look to federal bankruptcy law for guidance on this issue, Eaton Vance does not cite to any federal case law that persuades us that the commissioner was required to set up a cash reserve account.

¶ 134. In a separate argument, the LVM bondholders contend that the commissioner should have created a reserve account because none of the witnesses who testified in support of the rehabilitation plan asserted that a reserve account "was impracticable."

cash percentage at 25% because we have already concluded that the interested parties were not entitled to discovery and, in any event, they do not direct us to any legal authority in support of their argument.

¶ 135. The circuit court agreed with the commissioner that a cash reserve account was unnecessary based on the following finding:

> The cash-note split percentage was kept low at the outset to protect against the possibility of Ambac in the future finding itself unable to pay the cash portion . . . . The split percentage incorporates a conservative approach to Ambac's claims-paying resources and creates a cushion against worse-than-expected financial outcomes. For that reason, establishing reserves for long-term policies . . . would have been duplicative of OCI's already-conservative approach to claims-paying resources. . . . Even under the worst of the four scenarios presented by OCI, Ambac would still have a sufficient cushion above the 25 percent cash payments with which to pay at least some of the Surplus Note obligations.

Based on the above finding, we conclude that it was reasonable for the court to deny the requests for the establishment of a cash reserve account. We will not second guess the commissioner's determination that a cash reserve account was unnecessary because the commissioner carefully considered the advice of various experts on that issue, and it was in the best position to make that determination.

C. Setoffs

¶ 136. U.S. Bank National Association (U.S. Bank), acting in its capacity as trustee for certain residential mortgage-backed securities and other securities and obligations, argues in its individual brief that the trust policies are governed by New York law, "which grants policyholders both a statutory and common-law right of set-off." According to U.S. Bank, this right of

setoff "permits their premium and other payment obligations to be reduced by the amount of payments owed by" Ambac. For this reason, U.S. Bank contends that any premiums that the trusts have not paid should be reduced by the amount that Ambac owes to the trusts.

¶ 137. The commissioner responds that U.S. Bank has no right of setoff under Wisconsin law. According to the commissioner, WIS. STAT. § 645.56(2)(d) expressly denies the right of setoff when the obligation is to pay premiums to the insurer, such as the case here. We agree.

■■■

¶ 138. WISCONSIN STAT. § 645.56 governs setoffs "in connection with any action or proceeding" brought under ch. 645. Under § 645.56(1), setoffs are generally allowed, except as provided in subsection (2). Subsection (2)(d) provides that setoffs may not be allowed in favor of any person where "[t]he obligation of the person is to pay premiums, whether earned or unearned, to the insurer." § 645.56(2)(d). Although U.S. Bank's contract with Ambac is purportedly governed by New York law, the Wisconsin statute governing setoffs "controls the allowance of setoffs in ch. 645 proceedings." *McNamee v. APS Ins. Agency, Inc.*, 112 Wis. 2d 329, 335–36, 332 N.W.2d 828 (Ct. App. 1983). Because § 645.56 prohibits the right of setoff when the obligation is to pay premiums, we conclude that U.S. Bank is not entitled to a setoff of the unpaid policy premiums that U.S. Bank owes to Ambac.[18]

---

[18] U.S. Bank argues in a footnote in its individual brief that even if Wisconsin law applies, "Wisconsin law would, at most, only prohibit set-off of *premiums*" and not other payment obligations. However, U.S. Bank does not take into account that courts may enter injunctions to prevent the waste of the insurer's assets, which would occur here if the policyholders

## D. Control Rights

¶ 139. The Bank of America, N.A., Wilmington Trust Company and Wilmington Trust FSB (BOA), in their capacity as trustees for certain securitization trusts, Wells Fargo Bank, N.A., in its capacity as trustee for certain RMBS Trusts (Wells Fargo), and U.S. Bank argue in their individual briefs that the circuit court erred by entering an injunction enjoining them from exercising their control rights.[19] We refer to these interested parties collectively as the "trustee banks." The trustee banks argue that they should not be enjoined from exercising control rights because, according to the governing documents setting forth Ambac's rights and responsibilities, Ambac agreed to transfer its control rights to them in the event that Ambac defaulted on its contractual obligations, as it did here.[20] We understand the trustee banks to be arguing that the

were required only to make premium payments, and not to meet their other payment obligations. In any event, U.S. Bank does not develop an argument on the topic and therefore we do not further address it. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992).

[19] According to Peterson's fourth affidavit, control rights are contractual rights that generally permit an insurer to exercise certain rights, including

> the right to exercise control over the loan services (including the right to receive information such as loan files, and the right to terminate the servicer for failure to meet certain criteria), the authority to direct the trustee to assert rights under the transaction documents, the right to consent to amendments and waivers under the transaction documents, and the right to declare events of default, trigger events, and early amortization events.

[20] As we understand, the governing documents delineate the rights and responsibilities of Ambac with respect to transactions involving policies for which certain trustees may be

circuit court erroneously exercised its discretion in granting an injunction that prevents them from exercising their control rights granted to them in the governing documents.[21] *See Sunnyside Feed Co. v. City of Portage,* 222 Wis. 2d 461, 468, 588 N.W.2d 278 (Ct. App. 1998) (grant of injunction reviewed for erroneous exercise of discretion). We are not persuaded.

¶ 140. As we have indicated, in March 2010, the circuit court granted the commissioner's request for injunctive relief, which, as we have explained, enjoined the trustee banks from exercising their control rights. The trustee banks filed motions challenging the temporary injunction, which the circuit court denied on the ground that the court had broad discretion under Wis. Stat. § 645.05(1)(k) to enter an injunction to prevent any action that may waste or lessen Ambac's assets or prejudice the policyholders or the administration of the proceedings. The court stated that the commissioner's "ability to carry out [its] statutory duties" and to "protect the insured's interests as well as the interests of the creditors and the public with minimum interference with the normal prerogatives of proprietors" would be significantly harmed if the commissioner were not able to exercise control rights. As we indicated earlier in

policyholders. These documents may include pooling and servicing agreements and trust agreements.

[21] U.S. Bank also argues in its individual brief that the court erred in approving a provision in the injunction that prevents the trustee banks from prosecuting actions in *any* state. According to U.S. Bank, injunctions entered in Wisconsin under Wis. Stat. § 645.05 may be enforced only in this state, and therefore, if the commissioner wants the injunction enforced in other states, it must apply for injunctive relief in those states. We do not address this argument because U.S. Bank does not present a fully developed argument on the issue. *See Pettit,* 171 Wis. 2d at 646–47.

this opinion, the temporary injunction will continue to remain effect throughout the administration of the plan by operation of Section 10.02 of the plan.

¶ 141. The trustee banks argue that Ambac should not have the power to direct or control them because Ambac has stopped fulfilling its duties as the insurer. We disagree. The trustee banks do not take into account that it is the commissioner who has control rights, not Ambac. As we have indicated, the commissioner has "full power to direct and manage" and "to deal with the property and business of the insurer." Wis. Stat. § 645.33(2).

¶ 142. Wells Fargo and BOA argue that allowing them to exercise control rights would not necessarily have "any impact on the financial condition of Ambac or the Segregated Account." They observe that "[a]ny exercise of direction or control rights by [the trustee banks] would still be subject to the other restraints imposed by the [p]lan," including provisions that prevent the trustee banks from suing Ambac for failing to pay amounts due under the governing documents and from ceasing to make premium payments. However, the trustee banks fail to explain why the "other restraints imposed by the plan" would be sufficient to prevent the trustees from taking action that potentially could lessen the value of Ambac's assets and interfere with the administration of this rehabilitation proceeding.

¶ 143. Moreover, as the commissioner asserts in its response brief, "removing Ambac's control rights would harm the interests of" policyholders and the public "with no countervailing benefit." In support, the commissioner cites to Peterson's fourth affidavit, which the circuit court relied on in denying the challenges to the injunction. Peterson states in his affidavit that it is essential that the trustee banks are enjoined from

exercising control rights in order "to adequately protect claims-paying resources from unnecessary losses—such as those that might accompany an untimely termination and liquidation of collateral, or an underperforming servicer." Enjoining the trustee banks from exercising control rights is also essential, according to Peterson, so that the commissioner may "engage in remediation efforts to recover losses caused by third parties' misrepresentations, breaches of warranty, or other acts or omissions." Although the trustee banks argue that their exercise of control rights *might* not have a financial impact on Ambac, they provide no evidence to counter the circuit court's findings based on Peterson's affidavit that allowing the trustee banks to exercise control rights would likely be damaging to the policyholders and the public in general.

¶ 144. Peterson further states in his affidavit that preventing the commissioner from exercising control rights "would not result in a corresponding gain for holders of the insured obligations." Peterson explains that once the commissioner loses the right to exercise the insurer's control rights "some of those rights are lost entirely; the holders do not acquire the right to exercise them." He further explains that "[t]hose rights that are transferred to the holders may be difficult to exercise effectively" because the holders may be required to reach a consensus in order to exercise those rights. Finally, Peterson explains that "if holders were able to exercise such rights, they would be under no duty to exercise them in a way that promotes (or at least does not hinder) the remedial goals of this rehabilitation." The trustee banks do not explain why they should be able to exercise control rights in light of the above.

¶ 145. Because the circuit court has broad powers to enter an injunction to prevent the waste of Ambac's

claims-paying resources, and the trustee banks have not shown that the court erroneously exercised its discretion in granting the injunction enjoining the trustee banks from exercising their control rights, we reject the trustee banks' arguments.

E. Administrative Burdens

¶ 146. Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each acting solely in its capacity for certain residential mortgage-backed securities and other securities and obligations ("Deutsche Bank"), BOA, and Wells Fargo for the RMBS Trustholders, in their individual briefs, argue that the rehabilitation plan unreasonably imposes unfair administrative burdens and exposes them to potential liability. We address each bank's arguments separately.

¶ 147. Deutsche Bank contends that the rehabilitation plan "attempts to shift additional costs and obligations onto the Trusts and Trustees without providing sufficient compensation or protection." Specifically, Deutsche Bank contends that the plan imposes substantial burdens on it because, in contrast to the governing documents which require Ambac to pay claims within two to three business days after receiving a notice of claim, the rehabilitation plan allows Ambac an indefinite period of time to evaluate segregated account claims, which "could delay claims payments." We do not respond to this argument because Deutsche Bank merely speculates that the plan will impose additional burdens on it and does not cite to any portion of the record in support of that claim. *See Pettit*, 171 Wis. 2d at 646 (we may decline to address arguments supported only by general statements).

¶ 148. Wells Fargo and BOA each contend that the rehabilitation plan will prejudice them by requiring the trustee banks to undertake new administrative burdens and incur additional uncompensated expenses to deliver the surplus notes. Specifically, they complain that implementing the plan will cause them to incur substantial additional costs because they are currently equipped to distribute only cash and will need to build new operational processes to deliver the surplus notes to policyholders. They also state that they anticipate incurring out-of-pocket expenses for professional services rendered by attorneys, accountants, and consults. Wells Fargo and BOA assert that the rehabilitation plan violates the terms of the governing documents by allegedly imposing these additional administrative burdens and expenses.[22] We are not persuaded.

¶ 149. Wells Fargo and BOA ignore the circuit court's finding that the burdens imposed by the plan were reasonable in "context of the Plan and in light of the scope and magnitude of the amounts at issue in this rehabilitation," particularly given that the commissioner has agreed to "work with trustees to avoid imposing unreasonable burdens upon them." The record bears this out.

¶ 150. The record shows that the commissioner has worked closely with the trustee banks to identify

---

[22] Wells Fargo and BOA also argue in conclusory fashion that the plan imposes unfair burdens because the trustees will be required to deliver surplus notes under Section 4.04(d) of the plan even when "another agent has the contractual responsibility for making distributions." However, the trustee banks do not explain how the plan should have been structured to avoid the imposition of this alleged burden. Because this argument is undeveloped, we do not address it. *Pettit*, 171 Wis. 2d at 646.

the burdens imposed on them and to assist in making the transition as efficient as possible. However, as the commissioner observes, the trustee banks have not identified specific issues that need to be addressed and have failed to quantify "the purported financial burdens," or offer suggestions as to how to lessen those burdens. It appears, then, that the commissioner agrees with Wells Fargo and BOA in principle that the plan does impose additional administrative burdens and costs, but explains that the trustee banks have not provided any specific information that could be helpful in assisting the commissioner in ameliorating those burdens. Consequently, the trustee banks cannot now complain about the additional burdens and costs the plan imposes on them to carry out their responsibilities under the plan. Moreover, if the trustee banks intend to argue that the commissioner acted arbitrarily and abused its discretion by including provisions in the plan that impose additional administrative and financial burdens on them, we observe that the trustee banks have not shown that any of these administrative and financial burdens are avoidable in the context of *any* rehabilitation plan.

¶ 151. Wells Fargo and BOA next argue that the circuit court approved the rehabilitation plan without "meaningfully analyz[ing] the additional duties, burdens and expenses that the Plan will impose" on them. The problem with this argument is that the trustee banks do not explain what more the court should have done to conduct a meaningful analysis of the "additional duties, burdens and expenses" the plan imposes. The trustee banks also fail to come forward with anything in the record that supports their view that the court did not meaningfully analyze the "additional duties, burdens and expenses."

¶ 152. We are satisfied that the circuit court's finding that the administrative burdens imposed are reasonable is supported by the record and the trustee banks have not shown that they are prejudiced by the burden of having to deliver the surplus notes to their insured certificate holders.

V. Earlier Appeals

¶ 153. In this part of our decision, we address arguments raised by the RMBS policyholders and the LVM bondholders (collectively referred to as "the Funds") in an appeal of an order by the circuit court denying motions challenging a settlement between Ambac and certain financial institutions, as well as an order by the court denying requests by the Funds to intervene and conduct discovery regarding the settlement and challenging the allocation of their respective policies to the segregated account.

¶ 154. We are presented with three arguments in this prior appeal. First, the Funds argue that the circuit court erred in denying their motions to intervene. Second, the RMBS policyholders argue that the formation of the segregated account and the transfer of the RMBS policies to the account were unlawful. Third, the Funds argue the court erred in failing to review a settlement agreement between Ambac, the commissioner, and financial institutions that held certain credit default swap contracts (the "Bank Group"). We refer to the settlement as the "CDS settlement." For reasons that have already been addressed in this opinion, and for the other reasons that follow, we reject all three arguments.

A. Background

¶ 155. The RMBS policyholders own, or are managers of entities that own, insurance policies insuring

the performance of certain securities, primarily residential mortgage-backed securities, that were allocated to the segregated account. The LVM bondholders are owners or managers of funds that own a majority of the outstanding first tier bonds issued by the State of Nevada to fund the construction of a four-mile monorail system in Las Vegas.

¶ 156. As we know, the commissioner petitioned the circuit court to enter an order of rehabilitation for the policies assigned to the segregated account and the court entered the order. As we also know, the court entered a temporary injunction. The court invited interested parties to file any objections to the temporary injunction order, which the RMBS policyholders and LVM bondholders did.

¶ 157. During this same time period, Ambac entered into a settlement agreement with the Bank Group. The CDS settlement commutes most of the credit default swaps entered into by an Ambac subsidiary. In exchange, Ambac paid the Bank Group $4.6 billion, consisting of $2.6 billion in cash and $2 billion in surplus notes. The funds for the settlement agreement came from the general account.

¶ 158. Soon after the Funds learned of the allocation of their policies to the segregated account and of the CDS settlement agreement, they filed emergency motions. The RMBS policyholders moved to modify the injunction "to preserve the status quo regarding the General Account." The LVM bondholders moved the court to review the settlement agreement. The Funds also sought to intervene in the proceedings and to conduct expedited discovery.

¶ 159. In May 2010, the circuit court orally denied the emergency motions. The court ruled that the commissioner had the authority to negotiate a settlement

with the Bank Group and that the circuit court did not have authority to review the regulatory activities of the commissioner. The court further stated that it would issue an order containing its findings of facts and conclusions of law.

¶ 160. The court subsequently issued its written order. Although the court indicated in its oral ruling that it had no authority to review the CDS settlement agreement, the court made written findings that the settlement "is a fair and reasonable compromise that will benefit policyholders of both the General and Segregated Accounts," in effect approving the settlement agreement. The court further concluded that the segregated account was formed in compliance with Wisconsin law and that the Funds were not entitled to intervene or to conduct discovery in rehabilitation proceedings. The CDS settlement closed in June 2010.

B. Motion to Intervene

¶ 161. The Funds argue that they met the statutory requirements for intervention as of right under Wis. Stat. § 803.09(1).[23] Accordingly, the Funds contend that the circuit court erred by denying the policyholders' motion to intervene. We disagree.

---

[23] The RMBS policyholders argue in the alternative that the circuit court should have permitted the policyholders to intervene as a matter of the court's discretion. *See* Wis. Stat. § 803.09(2) (permitting discretionary intervention where certain statutory criteria are met). The RMBS policyholders do not support their position with a fully developed argument. Moreover, the policyholders ignore that the court did in fact exercise its discretion under Wis. Stat. § 645.33(5) in rejecting their motion to intervene. The RMBS policyholders offer no reason why the court's exercise of discretion under § 645.33(5) was erroneous.

¶ 162. The Funds' argument rests on the incorrect premise that the Wisconsin rules of civil procedure apply in rehabilitation proceedings. As we have concluded, the rules of civil procedure do not apply to rehabilitation proceedings and therefore the intervention statute, which is contained in the rules of civil procedure, does not apply here.

¶ 163. The Funds also assert that WIS. STAT. ch. 645 has no statute governing intervention. We disagree. WIS. STAT. § 645.33(5) provides in broad and liberal terms that after a rehabilitation plan is filed with the circuit court for approval, the court may approve or disapprove the proposed plan, or modify it and approve it as modified after providing "notice and hearing as the court prescribes." We have explained that this language permits the circuit court to establish procedures that are tailored to the procedural necessities presented by the circumstances of each rehabilitation proceeding. That means that the rehabilitation court has the discretion to grant or deny a motion to intervene, and the Funds provide no other reason why the rehabilitation court erred in denying the motions to intervene.[24]

C. Segregated Account

¶ 164. The RMBS policyholders challenge the formation of the segregated account on several grounds.

[24] We note that Freddie Mac joined in the LVM bondholders' brief-in-chief and filed a separate reply brief. Freddie Mac does not respond to Ambac's and the commissioner's intervention arguments in its reply brief. We take Freddie Mac's failure to respond as a concession that the circuit court properly exercised its discretion in denying the motions to intervene. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (failure to respond to a proposition in a brief may be taken as a concession on that point).

We address here arguments raised by the policyholders in their briefs that were not addressed by arguments in the consolidated brief.

■

¶ 165. The RMBS policyholders contend that the allocation of their policies to the segregated account prior to the circuit court's order granting the commissioner's petition for rehabilitation was ineffective because it failed to meet the common law requirements for a novation: notice, mutual consent, and consideration. *See Siva Truck Leasing, Inc. v. Kurman Distribs.*, 166 Wis. 2d 58, 67, 479 N.W.2d 542 (Ct. App. 1991). In response, the commissioner argues that the establishment of the segregation account was not a novation under the common law. We agree with the commissioner.

■

¶ 166. Novation is a common law doctrine of contracts and is defined as a "mutual agreement among all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another, or a like agreement for the discharge of a debtor to his creditor by the substitution of a new creditor." *Navine v. Peltier*, 48 Wis. 2d 588, 593, 180 N.W.2d 613 (1970) (quoting another source). To be effective, a novation must be supported by consideration and the express or implied consent of the affected parties. *Id.* at 593–94; RESTATEMENT (SECOND) OF CONTRACTS § 280 (1981).

¶ 167. The RMBS policyholders assert that a novation has occurred here by the creation of the segregated account and the allocation of their policies to that account, but that the novation was ineffective. According to the RMBS policyholders, a novation occurred when the commissioner replaced Ambac's "obligation to

the RMBS policyholders with an obligation to the Segregated Account" and altered that obligation "so that claims will be paid only partly in cash and the rest in notes." However, according to the RMBS policyholders, the novation was ineffective because Ambac cannot show mutual consent to the novation and that sufficient consideration was provided to support the new obligation. This analysis is flawed for several reasons.

¶ 168. The RMBS policyholders assume, without providing any analysis, that the common law doctrine of novation applies in the context of a rehabilitation proceeding. They address the topic only in their reply brief where they cite to *Carpenter*, 10 Cal. 2d at 335, in which the California supreme court stated that "[e]very policyholder who consents to the [rehabilitation] plan clearly enters into a novation with the new company." The RMBS policyholders do not conduct any further analysis of whether the doctrine of novation applies in a rehabilitation proceeding. In the absence of any argument or authority that establishes the application of the doctrine in the context of rehabilitation proceedings, and after our independent research on the topic, we are not persuaded that the doctrine applies here.

¶ 169. There are sound reasons supporting the commissioner's position that the doctrine of novation does not apply to a rehabilitation proceeding in general, and under Wisconsin's rehabilitation statutory scheme specifically. Generally speaking, a novation under the common law of contracts operates as an "affirmative defense to a claim for breach of an earlier contract because a novation operates to discharge the prior agreement." 30 RICHARD A. LORD, WILLISTON ON CONTRACTS § 76:40 (4th ed. 2004) (footnote omitted). However, the interested parties have no right to assert affirmative defenses here because, as we have concluded, the inter-

ested parties are not formal "parties" to these proceedings and these are not legal proceedings.

¶ 170. Moreover, WIS. STAT. § 611.24(2) provides that a corporation "may establish a segregated account for any part of its business" and does not impose any obligation on the corporation to obtain the consent of the policyholders allocated to the segregated account. We agree with Ambac that "such a requirement should not be read into the statute through application of the common law doctrine of novation."

¶ 171. Indeed, the application of the common law doctrine of novation to rehabilitation proceedings runs contrary to the stated purpose of the rehabilitation statutory scheme. As we have explained, rehabilitation proceedings in Wisconsin "should emphasize the management process, not the legal process." Comment to WIS. STAT. § 645.01(4), 1967 Wis. Laws, ch. 89, § 17. Applying the common law doctrine of novation to a rehabilitation proceeding under ch. 645 would be a step toward transforming a management process into a legal process.

¶ 172. The RMBS policyholders contend that it does not matter whether novation may be applied in the context of rehabilitation proceedings because the policies were allocated to the segregated account prior to the commencement of rehabilitation proceedings. This contention rests on a technicality that is ultimately irrelevant. This argument fails to take into account that the commissioner established the segregated account for the sole purpose of commencing a targeted partial rehabilitation of the segregated account and thus the creation of the segregated account was in connection with the rehabilitation proceedings.

¶ 173. Even if we were to assume that the common law doctrine of novation applies in a rehabilitation proceeding, the RMBS policyholders fail to establish that the criteria for novation have been met. As we have indicated, "[a] novation contemplates a substitution of a new contract for a previous one." *Navine*, 48 Wis. 2d at 594 (quoting another source). Here, the RMBS policyholders do not point to any evidence that clearly shows that the transfer of the RMBS policies to the segregated account resulted in a new obligation being substituted for an old one. In addition, even though the policies have been allocated to the segregated account, Ambac continues to be obligated to the RMBS policyholders by virtue of the fact that all claims filed by policyholders will be satisfied by funds out of the general account, which is held by Ambac.

D. Unconstitutional Taking

¶ 174. The RMBS policyholders contend that the transfer of the RMBS policies to the segregated account was an unconstitutional taking in violation of the Wisconsin and United States constitutions. According to the RMBS policyholders, a taking has occurred because the commissioner approved the creation of a segregated account without adequately capitalizing it. The RMBS policyholders also assert that a taking has occurred because the commissioner impaired their contractual rights without providing just compensation. We disagree.

¶ 175. First, to the extent that the policyholders assert that the unconstitutional taking occurred because the segregated account was not adequately capitalized, we have already rejected that argument and do not address it further here.

■

¶ 176. Second, to the extent that the policyholders assert that a taking has occurred because their contractual rights have been impaired, they cite to no legal authority to support the proposition that the mere approval of the segregated account and allocation of the RMBS policies to the segregated account amounts to an impairment of a contractual right. And even if it did, it is well established that policyholders do not have "the inviolate rights that characterize private contracts. The contract of the policyholder is subject to the reasonable exercise of the state's police power." *Carpenter*, 10 Cal. 2d at 329. The commissioner reasonably exercised its discretion in establishing a segregated account for part of Ambac's business, as the commissioner is permitted to do under WIS. STAT. § 611.24(2).

¶ 177. Furthermore, we reject the argument that an unconstitutional taking has occurred because the RMBS policyholders do not take into account several important facts that we have already set forth earlier in this opinion, including that the policies allocated to the segregated account have access to almost all of the assets held in the general account; the policies allocated to the segregated account are expected to receive at least part of their claims in cash; and the purpose of creating a segregated account and allocating the riskiest policies to that account was to prevent the entire corporation from collapsing, which would not have been in the interests of any of the policyholders, including the RMBS policyholders.

E. Due Process

■

¶ 178. The RMBS policyholders contend that the circuit court violated their due process rights by failing

to provide them with notice and the opportunity to be heard prior to the commissioner's approval of the segregated account. They argue that, under general due process principles, they have a constitutional right to receive notice and an opportunity to be heard before they are deprived of their property rights and that no such rights were afforded them prior to the commissioner's approval of the segregated account.

¶ 179. In response, the commissioner takes the position that the due process clause of the United States Constitution does not entitle the RMBS policyholders to any process prior to the formation of the segregated account or prior to the commissioner filing a petition for rehabilitation of the segregated account because the policyholders possessed no discernible, recognized property interest in the contractual rights the policyholders are asserting. The commissioner further argues that the due process clause does not apply because the commissioner's approval of the segregated account itself did not deprive the RMBS policyholders of life, liberty, or property. *See* U.S. Const. Amend. XIV.[25] We agree.

¶ 180. The RMBS policyholders have not shown that due process required that they receive notice and the opportunity to be heard before the commissioner approved the establishment of the segregation account and before the commissioner filed a petition with the circuit court for an order of rehabilitation. As the commissioner points out, the policyholders have not shown that the commissioner deprived the policyholders of property by the mere approval of the segregated account and the placement of the RMBS policies into that account.

---

[25] U.S. CONST. amend. XIV, § 1 provides that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

636

¶ 181. We also are satisfied that providing notice and the right to be heard prior to the formation of the segregated account would impose an unreasonable administrative burden on the commissioner and an unreasonable risk to Ambac's business. The commissioner argues that providing notice and the right to be heard would have enhanced the risk that entities would have "attempted to exercise the various *ipso facto* and insolvency triggers in their contracts." The commissioner maintains that if those triggers had been "pulled, it would have had a disastrous effect on [the commissioner's] effort to rehabilitate Ambac and protect policyholders."

¶ 182. The circuit court entered a finding to this effect. In its findings of fact regarding the emergency motions filed by the RMBS policyholders and the LVM bondholders, the court found that engaging in settlement negotiations with all of Ambac's policyholders and beneficiaries would be impractical because of the large volume of policies held by Ambac—almost 15,000 policies across approximately twenty distinct exposure categories—and the difficulty of identifying the policyholders of certain types of policies, including those held by intermediate trustees. The court also found that "any non-confidential discussions with policyholders would have greatly enhanced the risk that parties would have exercised certain triggers in their contracts with Ambac, which would have had a disastrous effect on Ambac's financial condition." The RMBS policyholders do not allege that this factual finding was clearly erroneous and we see no reason to upset this finding.

¶ 183. Finally, there is no reason to believe that the RMBS policyholders have been prejudiced by the alleged failure to receive notice prior to the formation of the segregated account and the allocation of the RMBS

637

policies to that account because they had a meaningful opportunity to participate at the hearing on the approval of the rehabilitation plan. At the hearing, they were permitted to raise their objections to the creation of the segregated account and their allocation to that account, and the court considered those objections before approving the plan. Thus, to the extent that the RMBS policyholders had a right to be meaningfully heard, they were ultimately provided with greater due process protections than required under the rehabilitation statutory scheme.

### F. CDS Settlement

¶ 184. The Funds contend that the circuit court erred in determining that it lacked authority to review the CDS settlement.[26] According to the RMBS policyholders, judicial review of the settlement was required for two reasons: first, because under the terms of the cooperation agreement between the segregated account and Ambac, the segregated account must consent before Ambac transacts any business that involves proceeds in excess of $5 million, and the segregated account did not consent to the CDS settlement; and second, because the general account "is inextricably intertwined with" the rehabilitation of the segregated account and depletion of the assets held in the general account will diminish the assets available to the segregated account.

---

[26] As a threshold matter, the commissioner and Ambac argue in their response briefs that the Funds lacked standing to challenge the settlement agreement. We assume for purposes of this opinion that the Funds had standing to challenge the settlement and proceed directly to the merits of the arguments raised by the Funds.

¶ 185. We assume without deciding that the court was obligated to review the CDS settlement. However, we conclude that the court properly reviewed and approved the settlement as demonstrated by the court's findings of fact and conclusions of law regarding the settlement, which were made after extensive briefing and argument on the matter.[27]

¶ 186. The LVM bondholders contend that the court failed to conduct a meaningful review of the settlement and instead "uncritically adopted" the commissioner's reasoning. In support, the LVM bondholders cite to *Trieschmann* and to federal bankruptcy cases, which, according to the LVM bondholders, demonstrate that a court commits reversible error when it fails to state its reasoning for a decision on the record.

¶ 187. The LVM bondholders cite to no case that suggests that a court must specifically state its reasoning in a context such as the one here. As we have already concluded, *Trieschmann* does not apply outside the context of family law matters and there is no requirement that a court provide findings of fact and conclusions of law in the context of rehabilitation proceedings. *See In re Callahan*, 102 Wis. at 561. Moreover, we are not bound by the decisions of federal bankruptcy courts, which are governed by their own statutory rules and procedures and not by the flexible and informal procedures that apply in the rehabilitation context.

---

[27] We point out that the commissioner and Ambac argue that, assuming the Funds have standing to challenge the settlement agreement, the issue is whether the court erred in denying the Funds' motions to enjoin the bank settlement based on the four criteria for granting a temporary injunction. However, we instead frame and analyze the issue as whether the court conducted a sufficient review of the settlement because that is how the Funds frame and argue the issue.

¶ 188. Regardless, the circuit court provided a general explanation as to why it was denying the motions of the LVM bondholders and RMBS policyholders. It is true that the court indicated its belief that it lacked authority to review the settlement. However, after hearing extensive arguments on the issue, and reviewing the briefs presented, the court also expressed that it was to give "due deference" to the expertise of the commissioner and that it was not its role to substitute its reasoning for the commissioner's reasoning. Thus, the court at least implicitly indicated that there was no basis to challenge the commissioner's decision to enter into the settlement.

¶ 189. Moreover, the LVM bondholders and RMBS policyholders do not challenge any of the court's specific findings of fact or conclusions of law regarding the settlement. The court stated in its findings that "[a] compromise between Ambac and the Bank Group was and remains important to the financial condition of Ambac and the interests of policyholders." The court also noted that Ambac and the Bank Group selected an independent appraiser to value the Bank Group's claims and that the commissioner performed its own analysis of the appraisals and determined that they are "fair and reasonable estimates," of the massive losses to be expected absent a settlement agreement. The court further stated:

> The proposed Bank Group Settlement benefits all policyholders of Ambac's General Account and the Segregated Account. Settling the growing, volatile [credit default swap] exposures at a major discount inures to the benefit of all other policyholders by capping those exposures, eliminating the possibility of costly, slow-moving mark-to-market litigation that would reduce recoveries to policyholders in the Segre-

gated Account, impair Ambac's ability to provide continuing coverage to policyholders in the General Account, and delay the ultimate resolution of Ambac's financial situation.

¶ 190. The LVM bondholders and RMBS Policyholders do not provide any basis to conclude that the commissioner abused its discretion in entering into a settlement that the court found protects the interests of policyholders, creditors, and the public by avoiding the massive losses that would have resulted had the commissioner not agreed to a settlement.

¶ 191. The LVM bondholders and RMBS policyholders next contend that the court erroneously exercised its discretion in denying their requests to conduct discovery to determine whether "the settlement was in the interests of the Segregated Account." However, they do not explain why they were entitled to conduct discovery regarding the settlement and, as we have also already concluded, there is no right to conduct discovery in connection with rehabilitation proceedings.

¶ 192. The LVM bondholders also argue that the court failed to "apprise itself of key facts bearing on the settlement's fairness." The LVM bondholders contend that the court failed to consider, for example, whether the settlement would give priority to certain creditors over policyholders in violation of the priority scheme set forth in Wis. Stat. § 645.68. However, as we have already concluded, the priority scheme does not apply to rehabilitation proceedings. Consequently, even assuming that the court should have given more careful consideration to the "key facts bearing on the settlement's fairness," the court's error was harmless. Based on the above, we conclude that the circuit court

conducted a sufficient review of the settlement and properly denied the motions challenging the settlement.

## CONCLUSION

¶ 193. After giving full consideration to the objections, contentions, and arguments and after a careful examination of the record before us and of the circuit court's findings and conclusions of law, we conclude that the circuit court properly exercised its discretion in confirming the rehabilitation plan at issue in this case. We further conclude that the interested parties have not met their burden to prove that any of the actions taken by the commissioner and subsequently approved by the court were arbitrary or an abuse of the commissioner's discretion. Accordingly, we affirm.

*By the Court.*—Orders affirmed.